**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| (1) JOE T. SMITH AND (2) JAMIE SMITH | ) | |
| | ) | |
|      Plaintiffs, | ) | |
| vs. | ) | |
| | ) | |
| (1) SENTINEL INSURANCE COMPANY, LTD., | ) | Case No. 4:10-cv-269 |
| a Connecticut corporation; | ) | GKF-PJC |
| | ) | |
|      and | ) | |
| | ) | |
| (2) THE HARTFORD FINANCIAL SVCS. | ) | |
| GROUP, INC., a Delaware corporation, | ) | |
| | ) | |
|      Defendants. | ) | |

## PLAINTIFFS' COUNTER-MOTION FOR PARTIAL SUMMARY JUDGMENT

Bradley A. Gungoll,  OBA#3660
Wade D. Gungoll, OBA #21690
-Of the Firm-
GUNGOLL JACKSON
3030 Chase Tower
100 North Broadway
Oklahoma City, OK  73102
(405) 272-4710
(405) 272-5141
gungoll@gungolljackson.com
wgungoll@gungolljackson.com
**-ATTORNEYS   FOR   PLAINTIFFS-**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

UNDISPUTED FACTS ...................................................................................................... 2

    Corporate Structure of The Hartford ............................................................................ 2

    Premium Payments from Sentinel to HFSG ................................................................ 3

    The Hartford Pooling Arrangements ............................................................................ 5

    Resources Provided by HFSG to its Insurance Subsidiaries ....................................... 6

    "The Hartford" Name and Trademarks ......................................................................... 8

    Representations that HFSG is an Insurance Company .................................................. 9

    The Subject Policy ....................................................................................................... 11

STANDARD OF REVIEW .............................................................................................. 12

ARGUMENT & AUTHORITY ....................................................................................... 13

    I.    HFSG is liable as an insurer under the rationale set forth by the Oklahoma Supreme Court in Oliver v. Farmers Insurance Group. ..................................................................... 14

        A.    The Controlling Law ................................................................................. 14

        B.    *Oliver v. Farmers Insurance Group* ........................................................ 14

        C.    The Farmers Group of Companies vs. The Hartford.................................. 16

    II.    In addition to be vicariously liable, HFSG is directly liable because it has not only held itself out to be an insurer, it actually is carrying on an insurance business. ............................ 18

        A.    HFSG is "Conducting an Insurance Business"......................................... 18

        B.    HFSG Holds itself out to be an Insurance Company................................. 21

    III.    HFSG is in contractual privity with the Plaintiffs as the only legally-recognized entity identified in Policy, or alternatively as the agent for an unidentified principal........................ 23

CONCLUSION.................................................................................................................. 25

## TABLE OF AUTHORITIES

**Cases**

*Badillo v. Mid-Century Insurance Company*, 2005 OK 48, 121 P.3d 1080. ................................ 21

*Boulden v. Colbert Nursing Home, Inc.*, 2011 OK CIV APP 21, 249 P.3d 105, 109 ................. 18

*Demery v. Hartford Underwriters Insurance Company*, Case No. A114289, 2008 WL 534721
   (Cal. Ct. App Feb. 28, 2008) ................................................................................................ 7, 8

*Fanning v. Brown*, 2004 OK 7, 85 P.3d 841, 848 ........................................................................ 18

*Oliver v. Farmers Insurance Group*, 1997 OK 71, 941 P.2d 985 ........................................ passim

*Reasonover v. St. Louis County, Mo.*, 447 F.3d 569, 578 (8th Cir. 2006) .................................... 13

*Schwartz v. Elec. Data Sys., Inc.*, 913 F.2d 279, 284 (6th Cir. 1990) ........................................... 22

*Wis. Knife Works v. Nat'l Metal Crafters*, 781 F.2d 1280, 1282 (7th Cir. 1986) ......................... 22

*Wolf v. Prudential Ins. Co. of America*, 50 F.3d 793 (10th Cir. 1995) ........................................ 12

**Statutes**

36 O.S. § 1204 ............................................................................................................................... 21

36 O.S. § 3613 ............................................................................................................................... 23

36 O.S. § 6103.1 ............................................................................................................................ 19

36 O.S. § 6103.2(A) ....................................................................................................................... 19

36 O.S. § 6103.2(C) (4) ............................................................................................................ 19, 20

36 O.S. § 6103.2(C) (6) .................................................................................................................. 19

**Other Authorities**

RESTATEMENT (THIRD) OF AGENCY, §§ 6.03(2), 6.02(2) ............................................................ 24

## INTRODUCTION

The Hartford Financial Services Group, Inc. ("HFSG") has asserted that it is not a proper party to this case and cannot be held liable for breach of contract or for bad faith. Lately, HFSG has used this refrain as the basis to refuse discovery on relevant issues. The original mythology behind HFSG's claim to civil immunity is that HFSG is purportedly not an insurance company, does not hold itself out as such, and was not a party to the underlying insurance contract. Despite HFSG's refusal to cooperate in discovery, the legal and factual bases for HFSG's proclaimed immunity have since been debunked through third-party sources, discovered by Plaintiffs. This newly-discovered information (significant portions of which were requested, but not produced, in discovery) establishes three bases for HFSG's amenability to suit as an insurer:

First, the undisputed facts as to HFSG's business operations are identical to those in *Oliver v. Farmers Insurance Group*, 1997 OK 71, 941 P.2d 985, in which the Oklahoma Supreme Court recognized the potential liability an insurance group's holding company.

Second, HFSG is directly amenable to suit for breach of contract and for bad faith based solely on its own acts and representations. The undisputed material facts make clear that HFSG is not only holding itself out to be an insurance company, it actually is one.

Third, HFSG is, in fact, a party to the insurance contract as the only legally-recognized Hartford entity identified in the certified copy of the policy.

On these grounds, Plaintiffs request summary judgment on HFSG's legally and factually insufficient defense that it cannot be held liable for breach of the Policy or for bad faith on the basis that it purportedly does not act as an insurer and is not a party to the contract. Plaintiffs' also request reimbursement for the attorney's fees and costs incurred in preparing this motion – said fees and costs to include the hours spent scouring through court filings, public financial

statements, and other third-party resources, in an effort to glean discoverable information that HFSG refuses to provide.  While the information discovered is more than sufficient to warrant summary judgment, the do-it-yourself approach to discovery advocated by HFSG is an inefficient substitute for good faith compliance with the Federal Rules of Civil Procedure.

## UNDISPUTED FACTS

### Corporate Structure of The Hartford

1.      HFSG is the purported holding company of a group of approximately 115 subsidiary companies – all operating under the trade name "The Hartford."  *See* (Ex. 1, *HFSG's 10K, filed Feb. 25, 2011*, pp. II-6 – II-7); and (Ex. 2, *Organizational Chart for The Hartford*).

2.      "The Hartford" is not itself a legal entity, but rather a federally-registered trademark with associated logos, under which HFSG and all of its subsidiaries do business.   *See* (HFSG's Reply in Support of Motion to Dismiss, [Doc. 22], pp. 1-2); *see also* (Ex. 1, pp. 5).

3.      Sentinel is one of HFSG's wholly-owned subsidiaries.  *See* (Ex. 3, *Sentinel's 2010 Annual Statement*, pp. 14.8 and 94).

4.      Sentinel was formed in 1999, and reported a total of $145 Million in total assets for 2010.  (Ex. 3, pp. 1-2).

5.      In contrast, Hartford Fire Insurance Company ("Hartford Fire") – HFSG's oldest and largest subsidiary – was formed in 1810 and reported a total of nearly $26 Billion in assets for 2010.  (Ex. 4, *Hartford Fire's Annual Statement for 2010*, pp. 1-2).

6.      Similar to Harford Fire, HFSG claims to have celebrated its 200th Anniversary in 2010 – a year in which it reported a total of more than $318 Billion in assets. *See* (Ex. 5, *HFSG Bi-Centennial Press Release*); *see also* (Ex. 1, pp. F-4).

7.      HFSG owns 100 percent of the common stock of Sentinel.  (Ex. 3, pp. 94).

8.     As one of HFSG's wholly-owned subsidiaries, Sentinel's tax return is consolidated and jointly filed with HFSG's tax return.  *See* (Ex. 3, pp. 14.5).

9.     Sentinel and HFSG have common officers and directors.   Specifically, as of December 31, 2010, the persons below served dual roles as officers/directors of both companies:

| Name | Title at Sentinel | Title at HFSG |
|------|-------------------|---------------|
| Andre Napoli | CEO and President | Exec. V-P / Pres. of Consumer Mkts. |
| Jonathan Bennett | Exec. V-P | Exec. V-P, Digital Commerce & Customer Analytics |
| Alan Kreczko | Exec. V-P and General Counsel | Exec. V-P and General Counsel |
| Gregory McGreevy | Exec. V-P and CIO | Exec. V-P and CIO |
| Andrew Pinkes | Exec. V-P | Exec. V-P and Acting Head of Commercial Mkts. |
| Eileen Whelley | Exec. V-P | Exec. V-P, Human Resources |

*Compare* (Ex. 1, pp. 124-26); *with* (Ex. 3, pp. 1).

10.    Similarly, in 2007, when the subject-insurance policy was effectuated, Sentinel and HFSG shared the following officers and directors:

| Name | Title at Sentinel | Title at HFSG |
|------|-------------------|---------------|
| Neal Wolin | CEO and President | Exec. V-P / Pres. and COO, Property & Casualty Ops. |
| David Johnson | Exec. V-P | Exec. V-P and CFO |
| Alan Kreczko | Exec. V-P and General Counsel | Exec. V-P and General Counsel |
| Eileen Whelley | Exec. V-P | Exec. V-P Human Resources |
| David Znamierowski | Exec. V-P and CIO | Exec. V-P and CIO |
| Richard Costello | V-P and Corporate Secretary | Corporate Secretary |

*Compare* (Ex. 6, *Sentinel's 2007 Annual Stmt.*, pp. 1); with (Ex. 7, *HFSG's 10K, filed Feb. 22, 2008*, pp. 174-75); and (Ex. 8, *HFSG's Responses to Pltf's Requests for Admissions*, pp. 4).

**Premium Payments from Sentinel to HFSG**

11.    According to HFSG's SEC filings, its principal source of cash flow comes from "dividends" paid from the net income of its subsidiaries – such as Sentinel.  (Ex. 1, pp. 5).

12.     The amount of dividends Sentinel may pay without approval of the Connecticut Insurance Commissioner is restricted based on Sentinel's net income.  (Ex. 6, pp. 14.5)

13.     In 2007, the year the subject policy was issued, Sentinel reported net income of $19,775,602.00.  (Ex. 6, pp. 4).  In 2008, the year the homeowner's claim at issue occurred, Sentinel reported net income of $3,775,519.00.  (Ex. 9, *Sentinel's 2008 Annual Statement*, pp. 4).

14.     Sentinel has three forms of income that combine to form its "net income":  (1) underwriting income, (2) investment income, and (3) finance/service charges not included in premiums (which Sentinel classifies as "other" income).  (Ex. 6, pp. 4); (Ex. 9, pp. 4).

15.     The primary source of Sentinel's underwriting income is attributable to "premiums earned."  (*Id.*).

16.     As noted above, Sentinel makes periodic payments to HFSG out of its net income and classifies these payments as "dividends."   During 2007 and 2008 (*i.e.* when the subject policy was in effect), Sentinel made dividend payments to HFSG as follows:

- On April 2, 2007, Sentinel paid an ordinary cash dividend of $31 Million to HFSG.

- On July 1, 2008, Sentinel paid an ordinary cash dividend of $15 Million to HFSG.

- On Oct. 30, 2008, Sentinel paid an extraordinary cash dividend of $165 Million to HFSG.

*See* (Ex. 9, pp. 14.5).

17.     Given the amount of "dividends" paid to HFSG, relative to the corresponding amount of Sentinel's net income, it is clear that a large portion of these payments are directly attributable to monies earned through insurance premiums.  (*Id.*).  As such, HFSG's Response to Plaintiffs' Interrogatory No. 10 – in which HFSG claims it "did not receive checks, payment or money tendered as payment for the premium on the Subject Policy" – is demonstrably false.  *See*

(Ex. 10, *HFSG's Discovery Responses*, pp. 8).  HFSG's denial appears to be based on the view that premiums cease to be premiums once they are filtered through a subsidiary.

18.     Notably, Plaintiffs were directed to make their premium payments to "The Hartford," rather than Sentinel.  (Ex. 11, *Premium Statements*).  As HFSG continually points out, "The Hartford" is not a legal entity.  Thus, it is unclear whether HFSG or one of its subsidiaries cashed Plaintiffs' premium checks.  However, it is clear that the net income attributable to such premiums was ultimately received by HFSG, through the pooling arrangement discussed below.

### The Hartford Pooling Arrangements

19.     Sentinel is one of approximately 14 Hartford subsidiaries participating in an inter-company property/casualty pooling arrangement whereby premiums, losses and insurance expenses (including personnel expenses) are reapportioned and shared by the members of the Pool in accordance with fixed participation percentages.  (Ex. 9, pp. 14.9).

20.     Under the property/casualty pooling arrangement, Hartford Fire assumes all direct business (except for accident and health business) written by the other pool members (such as Sentinel).  Hartford Fire then cedes a percentage of the total pool to each participant of the pool based on the pre-determined participation percentages.  Hartford Fire is considered the "lead company" in the pool and absorbs the reinsurance expenses associated therewith.  (*Id.*).

21.     Thus, under the pooling arrangement, any direct business written by Sentinel is assumed by Hartford Fire and redistributed to the members of the pool.  (*Id.*).  Notably, HFSG and Hartford Fire – HFSG's largest insurance company subsidiary and the lead company under the property/casualty pooling arrangement – have entered into a separate agreement whereby services and costs are allocated between HFSG and Hartford Fire.  *See* (Ex. 9, pp. 14.4).

22.     Additionally, all of the pool members are wholly-owned subsidiaries of HFSG, and thus like Sentinel, pay "dividends" back to HFSG that are directly attributable to premium payments from customers like the Plaintiffs.  *See* (Ex. 1, pp. II-6 – II-7).  Accordingly, and regardless of whether the Plaintiffs' premium checks were cashed by Sentinel, HFSG, Hartford Fire, or one of the other Hartford subsidiaries participating in the pooling agreement, the net income portion of such premiums made its way back to HFSG in the form of a dividend.

23.     Notably, this is true even if the Plaintiffs' premium checks were cashed by their local Hartford agent.  Specifically, The Hartford offers a program to local agents under which the agent's premium trust bank accounts are periodically "swept," with all payments being credited to Hartford Fire.  (Ex. 12, *Agency Sweep Agreement*).  As noted above, Hartford Fire is the lead company under the pooling agreement.  As such, all premiums swept into Hartford Fire's account attributable to business written by pool members would be redistributed amongst the pool according to participation percentages.  The economic reality is that any net premium income would then filter back up to HFSG through its subsidiary members of the pool.

24.     HFSG's interest in the premium collections of its subsidiaries is further evidenced by its practice of suing on behalf of its subsidiaries to recover allegedly misappropriated insurance premiums.  *See generally* (Ex. 19, *HFSG v. Carl J. Meil, Jr., Inc.*, et al.).

<u>**Resources Provided by HFSG to its Insurance Subsidiaries**</u>

25.     In exchange for siphoning the premium income from its subsidiaries, HFSG provides a variety of resources and other tools to its insurance company subsidiaries (such as Sentinel) in order to assist them in conducting an insurance business.  (See below).

26.     First, HFSG maintains an underwriting unit which it refers to as "Hartford Financial Products" ("HFP").  HFP is not a separate entity, as evidenced by HFP's absence from

HFSG's organizational chart, but rather is a "division" or "unit" of HFSG. (Ex. 13, *Corporate Disclosure Statement*); (Ex. 2); (Ex. 1, pp. 58, describing HFP as a "reporting unit" of HFSG).

27.     HFSG "establishes property and casualty reserves to provide for the estimated costs of paying claims under insurance policies written by the Hartford." (Ex. 9, pp. 14, ¶ 11).

28.     HFSG "maintains a full time Catastrophe Underwriting Unit which utilizes a number of internal and external models for calculating estimated catastrophe losses. The Hartford also utilizes a sophisticated monitoring, control, and loss estimation program to manage the accumulation of exposures on a country-wide basis." (Ex. 9, pp. 16, ¶ 6.2).

29.     "HFSG has a corporate law department that oversees litigation management and strategy for Hartford entities nationwide," including subsidiaries that do not have dedicated in-house counsel. *Demery v. Hartford Underwriters Insurance Company*, Case No. A114289, 2008 WL 534721, at * 6 (Cal. Ct. App Feb. 28, 2008) (attached hereto as "Exhibit 14").

30.     For certain of its insurance company subsidiaries, HFSG has guaranteed all potential liability for worker's compensation benefits. (Ex. 9, pp. 14.3, ¶ 10(E) (3)).

31.     HFSG has accepted transfer of electronic data processing equipment from one subsidiary and transferred such equipment to another subsidiary. From an accounting standpoint, HFSG reflects this transaction as a non-cash dividend from the transferring subsidiary and a non-cash capital contribution to the transferee subsidiary. (Ex. 15, *Hartford Fire's Annual Statement for 2008*, pp. 14.6, ¶ 10). From a practical standpoint, this reflects that HFSG is distributing equipment among its subsidiaries in order to assist them in conducting an insurance business.

32.     HFSG provides Sentinel and HFSG's other subsidiaries with the services of its Senior Vice President and Chief Actuary to provide the requisite statement of actuarial opinion needed for the subsidiaries' annual statements. *See, e.g.* (Ex. 9, pp. 15, ¶ 10).

33.     HFSG holds certain of the Sentinel's securities in physical form at HFSG's home office.  (Ex. 9, pp. 15.1, ¶ 22.1 – 22.2).

34.     With respect to employment practices, "[t]here are more than 27,000 employees of the various subsidiaries of HFSG."   However, "[w]ith the exception of a single foreign subsidiary, the individual employees of all of the HFSG subsidiaries . . . are each employed by and paid by Hartford Fire."   *Demery v. Hartford Underwriters Insurance Company*, Case No. A114289, 2008 WL 534721, at * 6 (Cal. Ct. App Feb. 28, 2008) (attached hereto as "Ex. 14"). This is reflected in Sentinel's financial records by virtue of the fact that it paid a total of $642.00 in payroll expenses for 2007 and $15.00 in 2008.  (Ex. 6, pp. 11) (Ex. 9, pp. 11)

35.     HFSG has a retirement plan under which designated employee contributions may be invested in the common stock of HFSG.  Contributions are matched up to a certain percentage by HFSG.  Sentinel employees are eligible to participate, as evidenced by the fact that Sentinel bears a share of the program's cost in accordance with its pooling percentage.  (Ex. 9, pp. 14.5).

## "The Hartford" Name and Trademarks

36.     Perhaps the most valuable resource provided by HFSG to assist its subsidiaries in the conducting of an insurance business is the ability to use "The Hartford" name and its associated trademarks / logos when marketing and selling insurance products.

37.     Notably, Hartford Fire (HFSG's largest insurance company subsidiary) is the owner of "The Hartford" trademark and trade name, as well as other Hartford marks such as the "Stag Logo."  (Ex. 16, *Complaint filed by HFSG against Moniker Online Services*, pp. 3, ¶ 5).

38.     However, since Hartford Fire is one of HFSG's wholly-owned subsidiaries, HFSG and its numerous other subsidiaries use "The Hartford" trade name and trademarks under the authority of Hartford Fire.  (Ex. 16, pp. 3, ¶ 6).

39.     By way of further assistance, HFSG – together with Hartford Fire and Hartford Life, Inc. – spend tens of millions of dollars annually in advertising and promoting The Hartford marks and the products and services provided under the Hartford marks.  (Ex. 16, pp. 5, ¶ 12)

40.     Through long and exclusive use and significant investment of time and money, The Hartford has developed enormous goodwill in its marks, which have come to be identified exclusively with the products and services of The Hartford.  Indeed, "The Hartford" name and marks are among the best known marks in the insurance business." (Ex. 16, pp. 6, ¶ 15).

41.     HFSG regards The Hartford's trademarks as extremely valuable assets in marketing HFSG's products and services.  (Ex. 1, pp. 12).  Indeed, HFSG values its goodwill at well over $1 Billion.  (Ex. 1, pp. F-4).  Through use of the Hartford's trademarks and trade name this goodwill filters down to HFSG's subsidiaries and assists them in marketing insurance.

## Representations that HFSG[1] is an Insurance Company

42.     Notably, HFSG has made numerous representations that HFSG is, in fact, an insurance company.  For example, HFSG's 10K states that HFSG (together with its subsidiaries) is an insurance and financial services company.  (Ex. 1, pp. 5).

43.     On July 15, 1999, HFSG filed suit against the Cleveland Public Library.  In the Complaint, HFSG claims it "issued a policy . . . of insurance" to the library, and also describes its investigation and denial of the claim.  No HFSG subsidiaries are parties to the case, and HFSG does not claim to bring the suit on their behalf.  (Ex. 17, *HFSG v. Clev. Pub. Library*).

---

[11]  In response to HFSG's Motion for Summary Judgment [Doc. 56], Plaintiffs cited myriad examples in which "The Hartford" held itself out as an insurance company.  Plaintiffs expressly incorporate by reference these examples into the instant motion and submit that such examples make clear that HFSG holds itself out as an insurer.  However, HFSG has previously argued that it is improper to conflate HFSG with "The Hartford" – despite the company's familiar refrain The Hartford is HFSG and its subsidiaries.  *See* (UMF ¶ 42).  In anticipation such sophistry, Plaintiffs submit these additional examples in which HFSG used its full corporate name – not just the trade name "The Hartford" – in holding itself out as an insurer.  *See* (UMF ¶¶ 42 - 49).

44.     Similarly, on Nov. 11, 2007, HFSG filed suit in the Southern District of New York, seeking recovery as "subrogee" under a certain policy of insurance allegedly provided by HFSG.  None of HFSG's subsidiaries are parties to the action, and HFSG does not purport to be bringing the action on behalf of any of its subsidiaries.  (Ex. 18, *HFSG v. C&G Delivery, et al.*).

45.     On June 15, 2005, an individual named David Owusu filed suit against a single defendant, identified in the Complaint as "Hartford Financial Services."  (Ex. 20, *Complaint by Owusu*).  In Paragraph 4 of the Complaint, Owusu alleged that:  "At all times mentioned herein, the defendant, Hartford Financial Services, (the "defendant" or "HFS") is an insurance company and is in the business of providing various types of insurance products to the general public, as well as the private sector.  Its principal place of business is located in Hartford, Connecticut and it employs well over 500 persons within the State of Connecticut."  (Ex. 20, pp. 2, ¶ 4).

46.     In responding to Owusu's complaint, HFSG modified the style of the case in its answer by changing the name of the defendant from "Hartford Financial Services" to "Hartford Financial Services Group, Inc."  (Ex. 21, *HFSG's Answer to Mr. Owusu's Complaint*).

47.     In response to the allegation that it is an insurance company, HFSG stated: "Defendant admits the allegations in Paragraph 4 of the Complaint."  (Ex. 21, pp. 1, ¶ 4).

48.     In the same case, HFSG filed a counter-claim, in which it stated:  "Defendant, The Hartford Financial Services Group, Inc., is a leading provider of … life insurance, … automobile and homeowner's insurance products and business insurance."  (Ex. 21, pp. 6, ¶ 1).

49.     In addition to court filings, HFSG has issued numerous press releases which belie the position that it does not hold itself out as an insurance company.  By way of example:

- On Aug. 20, 2009, HFSG issued a press release stating that:  "The Hartford Financial Services Group, Inc. (NYSE: HIG) announced today that the company has promoted

Michael Concannon, 47, to executive vice president of its property and casualty sales and distribution organization, effective immediately."  (Ex. 22, *Press Release Re: Michael Concannon*).   Mr. Concannon sent letters to the Plaintiffs regarding their "Hartford" policy, <u>enclosed with the bill for Plaintiffs' premiums</u>.  (Ex. 23, *Concannon Letters*).

- On Sept. 15, 2010, HFSG issued a press release stating that:  "The Hartford Financial Services Group, Inc. (NYSE: HIG) announced today that it has appointed Lisa Morgan to the position of senior vice president of its Middle Market commercial insurance business. (Ex. 24, *Press Release Re: Lisa Morgan*).

- On Oct. 18, 2010, HFSG issued a release stating that:  "The Hartford Financial Services Group, Inc. (HIG) has appointed Rex Sprunger, a senior vice president, as the division manager for the company's Western Division.  In his new role, Sprunger will lead The Hartford's sales and underwriting services . . . ."  (Ex. 25, *Sprunger Press Release*).

- HFSG recently issued a press release stating that:  "The Hartford Financial Services Group, Inc. has introduced a comprehensive, integrated marine policy . . . ."  (Ex. 26, *Press Release Re: New Marine Policy*).

- On Dec. 21, 2006, HFSG issued a release touting its "committed insurance team" and referencing "Claims Handler Bonnie Foster and Nurse Case Manager Barbara Hess <u>of the Hartford Financial Services Group, Inc. (NYSE: HIG), one of the nation's leading providers of workers' compensation insurance.</u>"  (Ex. 27, *2006 Press Release*).

### The Subject Policy

50.     Despite claiming that it is not an insurance company and is not a party to the underlying insurance policy (the "Policy"), HFSG is the only legal entity whose name is referenced in the policy.  A certified copy of the Policy is attached hereto as "Exhibit 28, pp. 36."

51.     The Policy does not contain "Sentinel Insurance Company" on any page thereof. *See* (Ex. 28); *See also* (Ex. 8, *HFSG's Responses to Plaintiffs' Requests for Admissions*, pp. 3).

52.     The endorsement in the Policy entitled "Sentinel Platinum Coverage Package" does not contain "Sentinel Insurance Company" in any sentence thereof.  *See* (Ex. 28); *See also* (Ex. 8, *HFSG's Responses to Plaintiffs' Requests for Admissions*, pp. 3-4).

53.     The computerized declarations page included with the Policy does not contain "Sentinel Insurance Company" one any page thereof.  *See* (Ex. 28, immediately following p. 36).

54.     The Policy does not contain any information by which the insurer could decode the abbreviations used in the computerized declarations page.  *See generally* (Ex. 28).

55.     The Policy was signed by "Richard G. Costello, Secretary" and "David Zwiener, President."  At the time the Policy was effectuated, Costello was the secretary for both HFSG and Sentinel, but Zwiener was the President of neither.  *See* (Ex. 8, *HFSG's Responses to Plaintiffs' Requests for Admissions*, pp. 4); and (Ex. 6, pp. 1); (Ex. 7, pp. 174-75).

## STANDARD OF REVIEW

Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' *Wolf v. Prudential Ins. Co. of America*, 50 F.3d 793 at 796 (10th Cir. 1995).  When applying this standard, the Court must examine the factual record and draw reasonable inferences therefrom in the light most favorable to the party opposing summary judgment.  *Id.*  An issue of material fact is genuine if a reasonable jury could return a verdict for the non-movant. *Id.*

Here, HFSG cannot in good faith respond to the instant motion with documentary evidence – as HFSG has refused to produce any.  Rather, Plaintiffs anticipate that HFSG will

come forward with another self-serving affidavit, replete with conclusory allegations. Notably, however, it is evidence – not contentions – that avoids summary judgment. *Reasonover v. St. Louis County, Mo.*, 447 F.3d 569, 578 (8th Cir. 2006) (Internal citations omitted). Moreover, in light of the evidence presented herein no reasonable jury could believe HFSG's position that it has not held itself out as an insurance company. As such, summary judgment is proper.

## ARGUMENT & AUTHORITY

Based on the material undisputed facts outlined above – most of which came directly from statements by HFSG – it is clear that HFSG's proclaimed immunity from bad faith liability has no basis in law or fact. First, and as explained below, HFSG's blurring of the lines of corporate separateness between it and its subsidiaries is sufficient as a matter of law to impute vicarious liability to HFSG under the alter ego doctrine, as applied to insurance groups by the Oklahoma Supreme Court in *Oliver v. Farmers Insurance Group*, 1997 OK 71, 941 P.2d 985.

Second, and regardless of whether HFSG considers itself a "mere holding company," its active role in assisting its subsidiaries in conducting an insurance business and its receipt of premium payments is more than sufficient to hold liable as an insurer under Oklahoma law. Notably, even if HFSG does not satisfy the requirements of being an "insurer," – and it does – HFSG's conduct in holding itself out as an insurer is sufficient for it to be held liable as one.

Third, as the only legal entity whose name is referenced in the Plaintiffs' Policy (*i.e.* the actual contract of insurance), HFSG <u>is</u> in contractual privity with the Plaintiffs. Moreover, the Policy was signed by HFSG's corporate secretary. Accordingly, HFSG is in direct privity by virtue of the Secretary's signature on the Policy. Alternatively, HFSG may also be held liable on the insurance contract to the extent that it executed the agreement as the agent for an unidentified principal (*i.e.* Sentinel – who is not identified in the Policy).

13

I.     **HFSG is liable as an insurer under the rationale set forth by the Oklahoma Supreme Court in *Oliver v. Farmers Insurance Group*.**

As the financial statements and annual reports of HFSG and its subsidiaries reveal, HFSG is not a mere holding company, but instead is actively engaged in assisting its subsidiaries in the conducting of an insurance business.  In doing so, HFSG ignores the strictures of corporate separateness and uses its subsidiaries as alter egos to orchestrate what appears to the public as a singular insurance business known as "The Hartford."  HFSG has essentially admitted as much in previous filings, but claims that its actions are valid under the law.  *See* ([Doc. 22], pp. 6-8) (attempting to be excused from the consequences of its actions on the basis that HFSG's corporate structure "merely mirror[s] those actions recognized industry-wide . . . .").

A.     **The Controlling Law**

HFSG's continued assertion of civil immunity appears to be based on a misunderstanding of which state's law applies to this case.  As noted above, throughout this lawsuit, HFSG has clung tightly to the theory that its self-described status as a "holding company" insulates HFSG from any liability as an insurer.  Notably, however, in making this assertion, HFSG has yet to identify the controlling Oklahoma case on this issue – *Oliver v. Farmers Insurance Group*, 1997 OK 71, 941 P.2d 985.  Despite the fact that *Oliver* is virtually analogous to the case at bar, HFSG has instead relied on cases from state courts in Georgia and Louisiana in its attempt to define the scope of potential liability for these purported "holding companies."  *See* [Doc. 22, at pp. 8). Since this case is governed by Oklahoma law – rather than Georgia or Louisiana law – *Oliver* provides the controlling standard for whether HFSG may be held liable on a vicarious basis.

B.     **Oliver v. Farmers Insurance Group**

The plaintiff's claims in *Oliver* arose in a similar context to the case at bar – *i.e.* allegations of breach of contract and bad faith insurance practices against a large, well-known

insurer.  *See Oliver*, 941 P.3d at 986.  The plaintiff initially filed suit against Farmers Insurance Company, Inc., but subsequently added as additional parties "Farmers Insurance Group of Companies," Farmers Insurance Exchange," and "Farmers Group, Inc."  In response to being added as a party-defendant, Farmers Group filed a motion for summary judgment on the basis that: (a) Farmers Group is not an insurance company, but a mere "management company," (b) Farmers Group is not licensed to transact insurance business in Oklahoma, and (c) Farmers Group was not in contractual privity with the Plaintiffs.  *Id.*

In response, the plaintiff in *Oliver* candidly admitted that she added the additional defendants because: (1) she purchased her policy through an agency that advertised itself as representing the Farmers Insurance Group; and (2) the subsidiary company through which her policy was actually issued was a rather small, Kansas-based subsidiary within the Farmers organization.  In opposing the motion, the plaintiff presented an organizational chart detailing the corporate hierarchy of the Farmers companies.  In addition, the plaintiff presented evidence that "The Farmers Insurance Group of Companies" and "The Farmers Insurance Group" were federally-registered service marks under which a group of property and casualty insurers conducted business.  *Id.* at 986, 988.  The evidence further revealed that the subsidiary companies operated under common management through Farmers Group, Inc. and that the group pooled its business in order to allocate premiums, expenses, and losses amongst the pooled members in accordance with percentages outlined in a written pooling agreement.  *Id.* at 986-87.

In light of the evidence presented by the plaintiff, the Court rejected Farmers Group's arguments that it could not be held liable since it was a mere "management company" and since it was not a party to the insurance contract.  In doing so, the Court noted that "[i]f one corporation is simply the instrumentality of another corporation, the separation between the two

may be disregarded and treated as one for the purpose of tort law." *Id.* at 987. The Court in *Oliver* further noted that the issue of whether a holding company may be held liable for the acts of its insurance company subsidiaries hinges primarily on the issue of control. *Id.*

In determining the degree of control exercised by the parent, the Court cited a non-exhaustive list of considerations, including: (1) whether the parent owns most or all of the stock; (2) the existence of common officers and/or directors; (3) whether the parent provides financing to the subsidiary; (4) whether the parent subscribes to the subsidiary's stock; (5) whether the subsidiary is undercapitalized; (6) whether the parent pays the salaries, expenses, or losses of the subsidiary; (7) whether a great deal of the subsidiary's business is with the parent or whether assets of the parent are conveyed to the subsidiary; (8) whether the parent refers to the subsidiary as a division or department; (9) whether the subsidiary follows direction from the parent's officers and directors; and (10) whether legal formalities for keeping entities separate are observed. *Id.* "Also important is the commonality of purpose between the corporations." *Id.*

Based on these factors, the Court found the evidence sufficient to allow the case to proceed to the jury on whether a purported holding company could be held liable for breach of an insurance contract and bad faith. The Court also cited two cases from California in which Farmers Group, Inc. had previously been held amenable to suit for bad faith. Lastly, the Court held that exposure for bad faith did not stop with the holding company and could also be asserted against the Farmers Group's federally-registered marks on the basis that they represented a group of companies that associated themselves together and transacted business for gain. *Id.* at 988.

C.   **The Farmers Group of Companies vs. The Hartford**

The facts of *Oliver* are remarkably similar to the case at bar, with the only true distinction being that the allegations in the instant came directly from HFSG – rather than through a hired

16

expert as in *Oliver* – and thus cannot be reasonably disputed.  The corporate structure and business model of Farmers appears to be identical to that of The Hartford.  Both companies have a "management company" or "holding company" at the top of the corporate hierarchy that assists the subsidiaries in conducting an insurance business.  While the subsidiaries are listed as the writing companies, the entire group of companies operates under a collective trade name, such as "The Hartford" or "The Farmers Group", and relies on the goodwill from a longstanding and uniform brand.   Likewise, both companies have a pooling agreement in which premiums, losses, and expenses are allocated by participation percentages. *See* (UMF ¶¶ 1-6, 19-24, 36-41).

In addition to these similarities, the relationship between HFSG and Sentinel satisfies several additional factors outlined by the Court in *Oliver* as material to the alter ego analysis. HFSG owns 100 percent of the stock in Sentinel.  (UMF ¶ 7).  The companies have common officers and directors, and thus operate under common management at the upper levels of both corporations.  (UMF ¶¶ 9-10).  The companies file joint tax returns.  (UMF ¶ 8).  HFSG provides assistance to its subsidiaries in The Hartford's combined effort to conduct an insurance business. (UMF ¶¶ 25-35).   HFSG siphons the premium income from its subsidiaries in the form of periodic "dividends" which are disproportionate to the subsidiary's net income, and require special permission from the state insurance commissioner.  (UMF ¶¶ 11-18).

In short, the undisputed material facts in the instant case go far beyond the allegations in *Oliver* and are sufficient for this Court to hold, as a matter of law, that HFSG is using Sentinel as an alter ego.[2]  As a result, under the controlling rule form *Oliver*, HFSG is not entitled to hide behind the corporate shield and assert that it is "a mere holding company."

---

[2] On several prior occasions, HFSG –realizing the merit of an alter ego argument against it – has argued that Plaintiffs are not entitled to assert an alter ego argument because they have not pleaded "claims for alter ego/piercing the corporate veil." *See* ([Doc. 22], pp. 3).  On this point,

**II.**      **In addition to be vicariously liable, HFSG is directly liable because it has not only held itself out to be an insurer, it actually is carrying on an insurance business.**

Similar to the defendant in *Oliver*, HFSG continues with the mantra that "it is not an insurance company" and is not licensed to conduct an insurance business in Oklahoma. However, the fact that HFSG does not consider itself to be an insurance company and is allegedly not the writing company on the Policy, does not conclude the analysis of whether it is, in fact, liable as an insurer.  More specifically, and leaving aside the issues of vicarious liability discussed *infra*, HFSG's own acts are sufficient to establish direct liability on two bases:  (1) Under Oklahoma law, HFSG is "conducting an insurance business" by virtue of the assistance and resources it provides to its insurance company subsidiaries and by virtue of the fact that it receives premium payments;  and (2) Even if HFSG did not satisfy the technical requirements of an "insurer" under Oklahoma law, it is, in fact, holding itself out as an insurer, which creates a special relationship between HFSG and the Plaintiffs – one which imposes a duty of good faith.

**A.**      **HFSG is "Conducting an Insurance Business"**

On the issue of whether HFSG is an "insurer" or is "conducting an insurance business," HFSG takes as dispositive that it is purportedly not the writing company on the Policy. However, HFSG again fails to consider the totality of Oklahoma law.

---

HFSG misapprehends the nature of an alter ego argument as if it were a separate theory of recovery.  It is not.  *Boulden v. Colbert Nursing Home, Inc.*, 2011 OK CIV APP 21, 249 P.3d 105, 109 (noting that "[a]n attempt to pierce the corporate veil is not itself a cause of action but rather is a means of imposing liability on an underlying cause of action").

With regard to HFSG's assertion that the alter ego doctrine must be pleaded with specificity, the applicable standard in this jurisdiction continues to be notice pleading.  *See Fanning v. Brown*, 2004 OK 7, 85 P.3d 841, 848.  In light of the fact that HFSG has repeatedly referenced the alter ego issue, it cannot seriously contend that it has been denied "fair notice of [the Plaintiffs'] claims and the grounds upon which they rest."  *Id.*  Notably, the Plaintiffs did, in fact, move to amend the pleadings in this case [Doc. 17], but that motion was denied.  [Doc. 49]. Regardless of the denial of that motion, it remains proper for the pleadings or the subsequent pretrial order be conformed to the substantial evidence on the alter ego issue.

The Oklahoma Legislature has declared that it is a subject of concern that many Oklahoma citizens hold policies of insurance issued by persons and insurers not authorized to do an insurance business in the State.  One of the specific concerns associated with the unauthorized conducting of an insurance business, is that such unauthorized parties may evade the insurance regulatory laws of this State.  36 O.S. § 6103.1.  In light of these concerns, the Oklahoma Legislature has provided a broad definition to what it means to be an "insurer" in this State and what it means to be "doing an insurance business" in this State.  *Id.*

More particularly, "the term insurer . . . includes all legal entities, associations, and individuals engaged as principals in the business of insurance."  36 O.S. § 6103.2(A).  Likewise, the same statute provides in pertinent part that conducting any of the following acts shall constitute the "doing of an insurance business" in this State:

- Maintaining an agency or office where any acts in furtherance of an insurance business are transacted, including the receiving or collection of any premiums, commission, membership fees, assessments, dues, or other consideration for any insurance or any part thereof.  *See* 36 O.S. § 6103.2(C) (4).

- Directly or indirectly acting as an agent for, or otherwise representing or aiding on behalf of another, any person or insurer in: (a) the solicitation, negotiation, procurement, or effectuation of insurance or renewals thereof; (b) in any other manner representing or assisting a person or insurer in the transaction of insurance with respect to subjects of insurance resident, located or to be performed in this state.  *See* 36 O.S. § 6103.2(C) (6).

Based on the undisputed facts identified above, HFSG is conducting an insurance business within the State.  Despite admittedly not being licensed to conduct an insurance business, HFSG is doing an insurance business in Oklahoma, by virtue of that fact that it is

receiving premiums and other consideration from the sale of insurance policies within this state. *See* 36 O.S. § 6103.2(C) (4); *see also* (UMF ¶¶ 11-24).  Indeed, on at least on occasion, HFSG has filed suit on behalf of its subsidiaries in an effort to collect such premiums.  (UMF ¶ 24).

In order to increase the premium-attributable income which HFSG siphons off of its subsidiaries, HFSG assists – or "aids" as stated above – its subsidiary insurers in the solicitation and procurement of new policies and renewals.  As noted above, this aid comes in several forms. By way of example:  HFSG maintains an underwriting unit called Hartford Financial Products. (UMF ¶ 26).  HFSG also established property and casualty reserves to provide for the estimated costs of paying claims under insurance policies written by the Hartford.  (UMF ¶ 27).  HFSG maintains a full time Catastrophe Underwriting Unit which utilizes a number of internal and external models for calculating estimated catastrophe losses.  (UMF ¶ 28).  HFSG maintains a corporate law department that oversees litigation management and strategy for Hartford entities nationwide, including those subsidiaries without dedicated in-house counsel.  (UMF ¶ 29).  In other instances, HFSG has guaranteed portions of the potential liability of one of its subsidiaries. (UMF ¶ 30).  HFSG has provided certain of its insurance company subsidiaries with the electronic data processing equipment necessary to conduct an insurance business.  (UMF ¶ 31).

HFSG – along with two other Hartford entities – spend tens of millions of dollars annually promoting the Hartford name and brand.  (UMF ¶¶ 36-41).  This directly aids the insurance company subsidiaries who operate under the name and capitalize on the goodwill created by HFSG.  HFSG also apparently uses its employees to send direct mail to Oklahoma consumers regarding policy procurement and renewal.  (UMF ¶ 49(b)).  Additional examples of the assistance provided by HFSG to its subsidiaries are contained in (UMF ¶¶ 32-35).  The undisputed fact that HFSG receives consideration attributable to premiums, assists in the

20

solicitation of policies, and assists in the conducting of an insurance business, warrants a finding

that HFSG is, in fact, an insurer under Oklahoma law and may be held liable as such.

**B.**    <u>**HFSG Holds itself out to be an Insurance Company**</u>

Notably, even if HFSG were somehow not found to be doing an insurance business in

Oklahoma, it is nonetheless liable as an insurer by virtue of the fact that it has held itself out as

such.  This practice is not only prohibited by statute, but also leads to a finding under Oklahoma

common law that HFSG may be held liable as an insurer under the Court's rationale in *Badillo v.*

*Mid-Century Insurance Company*, 2005 OK 48, 121 P.3d 1080.

Specifically, the Oklahoma Insurance Code expressly provides that "[n]o person that is

not an insurer shall assume or use any name which deceptively infers or suggests that it is an

insurer."  36 O.S. § 1204.  It is undisputed that: (a) HFSG uses the trade name "The Hartford";

and (b) that The Hartford trade name and associated marks are among the best known in the

insurance business.  (UMF ¶¶ 36 -41).  Accordingly, HFSG – by its own admission – is

operating under a name synonymous with insurance products, while simultaneously claiming to

this Court that it is not, in fact, holding itself out as an insurance company.

The Oklahoma Supreme Court recently addressed the consequences of a non-insurer, or a

non-party to an insurance contract, holding itself out as an insurer.  Specifically, the Court noted:

> *When a non-party to the insurance contract, based on the specific facts and circumstances existent, engages in activities or conduct such that it may be found to be acting sufficiently like an insurer so that a special relationship can be said to exist between the entity and the insured, we have made it clear that imposition upon said entity of the same duty of good faith and fair dealing as that imposed on the actual insurer issuing the insurance policy is appropriate.*

*Badillo v. Mid Century Insurance Company*, 2005 OK 48, 121 P.3d 1080, 1101.

Here, "the specific facts and circumstances" and well as HFSG's "activities and conduct"

reveal countless instances of HFSG holding itself out as an insurer.  Notably, many of these

21

examples have previously been mentioned, to the extent they were relevant to other analyses in this motion.   Moreover, the Plaintiffs' expressly adopt and incorporate by reference the numerous examples cited in its response to HFSG's motion for summary judgment [Doc. 56], in which "The Hartford" made specific representations to the Plaintiffs that "The Hartford" was their insurance company.  As noted herein, and on nearly every page of HFSG's website and other promotional materials – the Hartford <u>is</u> Hartford Financial Services Group, Inc. (and its subsidiaries).  (UMF ¶ 42).  Since HFSG does not operate to the exclusion of its subsidiaries – and instead expressly states that they operate together under the name, *i.e.* "The Hartford" – the examples from the Plaintiffs' response to HFSG's motion for summary judgment are directly applicable to this inquiry. *See* [Doc. 56, pp. 1-9].

Additionally, and in anticipation of the argument by HFSG that it should not be conflated with "The Hartford," the Plaintiffs have cited in this motion numerous examples in which HFSG holds itself out as an insurer, using its full legal name – Hartford Financial Services Group, Inc. Among the highlights of these examples are the following:

- HFSG maintains an underwriting unit which it refers to as "Hartford Financial Products." Such unit is not listed as a separate entity on HFSG's organization chart, but rather is a division or unit within HFSG.  HFSG also maintains a Catastrophe Underwriting Unit. (UMF ¶¶ 26, 28).    *See Schwartz v. Elec. Data Sys., Inc.*, 913 F.2d 279, 284 (6th Cir. 1990) (citing *Wis. Knife Works v. Nat'l Metal Crafters*, 781 F.2d 1280, 1282 (7th Cir. 1986) (noting that a division of a company does not possess "formal separateness" . . .).

- HFSG establishes property and casualty reserves to provide for the estimated costs of paying claims under insurance policies written by the Hartford.  (UMF ¶ 27).

- HFSG states that it <u>together with</u> its subsidiaries is an insurance company.  (UMF ¶ 42).

- HFSG filed suit against the Cleveland Public Library, and in its Complaint, stated that it issued a policy . . . of insurance" to the library.  (UMF ¶ 43).

- HFSG filed suit as a self-identified "subrogee" under an insurance policy.  (UMF ¶ 44).

- In a recent federal lawsuit, HFSG specifically corrected the style of the case to state its full legal name, and then went on to assert a counterclaim in which HFSG touted itself as "a leading provider of . . . homeowner's insurance products . . . ."  (UMF ¶ 48).

- HFSG has issued press releases suggesting that it is an insurance company.  (UMF ¶ 49).

When combined with the representations made to Plaintiffs in this case (*see* [Doc. 56, pp. 1-9), as well as the fact that HFSG is operating under a name it contends is one of the most recognized names in the insurance business, the undisputed facts show that HFSG has held itself out as an insurer, sufficient to create a special relationship and impose a duty of good faith.

## III.   HFSG is in contractual privity with the Plaintiffs as the only legally-recognized entity identified in Policy, or alternatively as the agent for an unidentified principal.

As noted at the outset, the central issue presented in this motion is whether, as a matter of law, HFSG is amenable to suit for breach of the Plaintiffs' insurance contract with The Hartford and for bad faith insurance practices.  HFSG has raised the defense that it cannot be held liable on the contract or for bad faith because it is not a party to the contract.  As noted below, HFSG's contractual privity defense is defective as a matter of law for two separate and independent reasons.  As such, the Plaintiffs are entitled to summary judgment on HFSG's privity defense.

First, HFSG is in privity with the Plaintiffs because HFSG is the only legally-recognized Hartford entity referenced by name in the entire certified copy of the Policy.  (UMF ¶ 50). Notably, the Oklahoma Insurance Code requires every policy to specify the names of the parties to the contract, including the insurer's name and complete address.  36 O.S. § 3613.  As noted above, HFSG – not Sentinel – is the only legal entity whose name appears in the Policy.

In addition, the Policy was signed by Robert Costello, whom HFSG states was the secretary for HFSG at the time the Policy was effectuated.  (UMF ¶ 55).  While Mr. Costello was also the secretary for Sentinel, "Sentinel Insurance Company" is not mentioned anywhere in the Policy, in the computerized declarations page, or in the endorsement entitled "Sentinel Platinum Coverage Package."  (UMF ¶¶ 51-55).  While Sentinel is identified in a separate declarations page – one not included with the certified copy of the Policy – HFSG has produced no evidence to show that the Plaintiffs were aware of this document at the time the contract was effectuated.

As an alternative basis to reject HFSG's privity argument, HFSG is also liable on the contract under well-accepted principals of common-law agency.  More specifically, HFSG is liable on the contract as the contracting agent for an unidentified principal.  *See* RESTATEMENT (THIRD) OF AGENCY, §§ 6.03(2), 6.02(2) (noting that an agent for an unidentified principal is a party to the contract unless the agent and third party agree otherwise).

Here, the Policy specifically states that "[t]he Company providing this insurance is the member of the Hartford Financial Services Group, Inc. designated in the Declarations (a stock insurance company)."  *See* (Ex. 28, pp. 36).  It is undisputed that no such entity was identified in the declarations page attached to the certified copy of the policy.  (UMF ¶53).  It is further undisputed that the corporate secretary for HFSG signed the Policy.  Assuming *arguendo* that Sentinel is the underwriting company for the Policy, then the agent who executed the Policy on Sentinel's behalf is also liable on the contract.  As noted above, Mr. Costello is the only person with any apparent relationship to either Sentinel or HFSG whose signature appears in the Policy. While Mr. Costello was the secretary for Sentinel as well, no reference to Sentinel Insurance Company is ever made throughout the entire policy.  Thus, no reasonable juror could determine that Mr. Costello was acting on behalf of Sentinel, to the exclusion of HFSG.

## CONCLUSION

As noted above, the purpose of the instant motion for summary judgment is to eliminate, once and for all, HFSG's affirmative defense that it cannot be held liable for breach of the Plaintiffs' insurance contract or for bad faith.  This motion <u>does not</u> request a ruling that HFSG actually breached the contract or that it actually acted in bad faith, as such issues are plainly for the jury.  Rather, the relief requested in this motion, if granted by the Court, will not only focus the issues in this case, but will also eliminate the majority of HFSG's purported bases for refusing to cooperate in the discovery process and its refusal to produce any documents.

Accordingly, and for the reasons outlined above, HFSG respectfully moves this Court for an order summarily adjudicating that (1) HFSG is amenable to suit for breach of the Plaintiffs' insurance policy and for bad faith insurance practices; and (2) that HFSG's affirmative defenses to these claims – *i.e.,* that it is purportedly not an insurer, purportedly did not act as an insurer, and purportedly is not in privity on the underlying contract – are legally and factually unsupportable.  Moreover, in light of the fact that the Plaintiffs have been forced to scavenge for the documents used in support of this motion – substantive portions of which were requested by Plaintiffs, but not produced by the Defendants – the Plaintiffs further request an order granting them their reasonable attorney's fees and costs incurred herein.

Respectfully submitted,

s/ Bradley A. Gungoll
Bradley A. Gungoll,   OBA#3660
Wade D. Gungoll, OBA #21690
-Of the Firm-
Gungoll Jackson
3030 Chase Tower
100 North Broadway
Oklahoma City, OK  73102
gungoll@gungolljackson.com
**-Attorneys for Plaintiffs-**

**<u>Certificate of Service</u>**

☑   I hereby certify that on this 12th day of May, 2011, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing. Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants:

David E. O'Meilia, OBA #6779
Phil R. Richards, OBA #10457
Amanda L. Stephens, OBA #22819
Richards & Connor, PLLP
ParkCentre Building, 12th Floor
525 South Main Street
Tulsa, OK  74103-4509

/s/ Bradley A. Gungoll
 Bradley A. Gungoll