1                    IN THE UNITED STATES DISTRICT COURT

2                   FOR THE NORTHERN DISTRICT OF OKLAHOMA

3

4     JOE T. SMITH, and                )
      JAMIE SMITH,                      )
5                                       )
                     Plaintiffs,        )
6                                       )
      V.                                )   No. 10-CV-269-GKF-PJC
7                                       )
      SENTINEL INSURANCE COMPANY,       )
8     LTD., a Connecticut corporation;  )
      and  THE HARTFORD FINANCIAL SVCS. )
9     GROUP, INC., a Delaware           )
      corporation,                      )
10                                      )
                     Defendants.        )
11

12                       TRANSCRIPT OF PROCEEDINGS

13                        HAD ON MAY 3, 2011

14                         MOTION HEARING

15

16    BEFORE THE HONORABLE PAUL J. CLEARY, Magistrate Judge

17

18    APPEARANCES:

19    For the Plaintiff:    Mr. Wade D. Gungoll
                            Gungoll Jackson Collins
20                          Box & Devoll, P.C.
                            Chase Tower 3030
21                          100 North Broadway
                            Oklahoma City, Oklahoma 73102
22
      For the Defendant:    Mr. David E. O'Meilia
23                          Richards & Connor
                            Park Centre Building, 12th Floor
24                          525 South Main Street
                            Tulsa, Oklahoma 74103
25

<u>PROCEEDINGS</u>

May 3, 2011

1       THE CLERK:  This is Case Number 10-CV-269-GKF-PJC, Joe

2  T. Smith and Jamie Smith vs. Sentinel Insurance Company, et al.

3  Counsel please state your appearances for the record.

4       MR. GUNGOLL:  Wade Gungoll for plaintiffs Joe and

5  Jamie Smith.

6       MR. O'MEILIA:  David O'Meilia on behalf of Sentinel

7  Insurance Company, Ltd.

8       THE COURT:  All right.  We're here on a motion for

9  protective order having to do with a 30(b)(6) deposition.  Is

10  that 30(b)(6) set for tomorrow?

11       MR. O'MEILIA:  Yes, Your Honor.

12       THE COURT:  Okay.  And we're still going forward with

13  that?

14       MR. O'MEILIA:  We have an agreement for another date.

15       THE COURT:  Okay.

16       MR. GUNGOLL:  However, Your Honor, we would like a

17  determination that the Exhibit A would be applicable to that

18  deposition even though it's not --

19       THE COURT:  In other words, that you don't have to

20  reserve the deposition notice?

21       MR. GUNGOLL:  Yes, Your Honor.

22       MR. O'MEILIA:  And that would be part of the agreement

23  as well, Your Honor and --

<u>PROCEEDINGS</u>

May 3, 2011

1       THE CLERK:  This is Case Number 10-CV-269-GKF-PJC, Joe

2   T. Smith and Jamie Smith vs. Sentinel Insurance Company, et al.

3   Counsel please state your appearances for the record.

4       MR. GUNGOLL:  Wade Gungoll for plaintiffs Joe and

5   Jamie Smith.

6       MR. O'MEILIA:  David O'Meilia on behalf of Sentinel

7   Insurance Company, Ltd.

8       THE COURT:  All right.  We're here on a motion for

9   protective order having to do with a 30(b)(6) deposition.  Is

10  that 30(b)(6) set for tomorrow?

11       MR. O'MEILIA:  Yes, Your Honor.

12  that?

13       THE COURT:  Okay.  And we're still going forward with

14  that?

15  that?

16       MR. O'MEILIA:  We have an agreement for another date.

17       THE COURT:  Okay.

18       MR. GUNGOLL:  However, Your Honor, we would like a

19  determination that the Exhibit A would be applicable to that

20  deposition even though it's not --

21       THE COURT:  In other words, that you don't have to

22  reserve the deposition notice?

23       MR. GUNGOLL:  Yes, Your Honor.

24       MR. O'MEILIA:  And that would be part of the agreement

25  as well, Your Honor and --

1          THE COURT:  Are you going to bring these 30 -- or at

2     least the first 30(b)(6) person down here?

3          MR. O'MEILIA:  Yes.  Yes, Your Honor, we're

4     anticipating no matter how many we need they will come here.

5          THE COURT:  They will all come down here.  All right.

6     Okay.  All right.  So Mr. O'Meilia, do you want to address your

7     motion?

8          MR. O'MEILIA:  Yes, Your Honor.  If the Court please.

9          THE COURT:  Okay.

10          MR. O'MEILIA:  Your Honor, we set forth in our brief a

11     number of objections.  The first thing that I would like to

12     just briefly touch on is the general overbreadth of many of the

13     topics here.  And this has been sort of an ongoing problem or

14     issue in this case between plaintiff and defendant in the sense

15     that plaintiff, at least in defendant's opinion, has propounded

16     numerous discovery requests, including the ones here, that are

17     significantly overbroad.  And then the goal, it seems, is then

18     to try to compromise and work those down.  And it's just

19     basically Sentinel's position that that's not what discovery is

20     for, is to start out with general broad, overbroad requests and

21     then try to work them by compromise down into something that --

22     that is agreeable to both parties.  And we don't think that's

23     for the Court either.  And we cited Regan-Touhy vs. Walgreen

24     Company which essentially has to do with written discovery, but

25     it's also applicable to all discovery, that the Court is not

1    required by any means to spend it's time cutting down overbroad

2    requests.

3          The first objection that we listed was objection to

4    Deposition Topic No. 5 which reads, "Discussions with third-

5    party roofing contractors regarding the condition of

6    plaintiffs' roof."

7          We believe that, as we said, the relevance of the

8    topic is not readily apparent, the scope is overbroad, it fails

9    to identify any conversations or discussions or -- and it

10   doesn't even ask who the -- you know, it doesn't tell us who

11   supposedly the discussions are.  And then, of course, in the

12   response by and objection by the plaintiff, they start off with

13   the fact that there is a claim note that says that we produced.

14   "Three different roofers disagree and claim the insureds has

15   hail damage to roof and needs replacement."

16          THE COURT:  Uh-huh.

17          MR. O'MEILIA:  Well, that doesn't indicate that there

18   are any discussions particularly because they attach as

19   exhibits paperwork from apparently third-party roofing

20   contractors that was provided because -- to Sentinel and their

21   adjuster in looking at this, but that doesn't identify or show

22   that there were any discussions and certainly doesn't identify

23   what discussions they're talking about.

24          THE COURT:  Have you checked with your folks to

25   determine whether or not anybody is aware of any such

1  discussions?

2       MR. O'MEILIA:  I have not, Your Honor.  Now, I'm --

3       THE COURT:  Let me stop you there.  I mean, wouldn't

4  that be the first step because if your folks say we just don't

5  know of any such discussions, you can advise Mr. Gungoll that,

6  you know, when the time comes at the deposition that, you know,

7  we've looked into it.  As far as we know there were no such

8  discussions with third-party roofers and if you can give us

9  more information we'll look into it.  But you've got some

10  obligation here to look into it in the first instance.

11       MR. O'MEILIA:  Well, my client, of course is dealing

12  with trying to designate or determining the designation of who

13  will be called to testify as the 30(b)(6) witness based on the

14  Court's ruling today.  So I'm not going to assume that they

15  have taken any steps to determine if there are any discussions.

16  It's just that Sentinel objects to this, it's -- We believe

17  that they at least have to identify what discussions they are

18  talking about and what evidence they have that there were

19  discussions before they give us a topic, a general topic of

20  discussions with third-party roofing contractors regarding the

21  conditions of plaintiffs' roof.  Obviously, their client had

22  some contact with these roofers and had discussions with these

23  roofers or they wouldn't have issued reports.  So, you know, it

24  doesn't even say Sentinel's discussions with third-party

25  roofing contractors or Sentinel's adjusters' discussions.  And

```
 1   that's the point of the objection.  Again, this is just
 2   overbroad on its face.
 3             THE COURT:  Okay.
 4             MR. O'MEILIA:  That would be the first.  Our objection
 5   to Topic No. 8.
 6             THE COURT:  Okay.
 7             MR. O'MEILIA:  "Details regarding Sentinel's business
 8   relationship with GAB Robins, Inc."
 9             As we indicated, shortly after The Sentinel adjuster
10   denied plaintiffs' roofing claim, plaintiffs contacted their
11   insurance agency and requested further investigation which
12   Sentinel then hired GAB Robins, who is an independent adjuster,
13   to do that.  And they determined that there was, I think, five
14   hundred and some dollars in damage to some screens and window
15   sills and things like that, but nothing to the roof and it was
16   well below the deductible and so the claim was denied or
17   continued to be denied.
18             THE COURT:  So Rob -- somebody from Robins did the
19   actual adjustment?
20             MR. O'MEILIA:  Did the second adjustment.  No, we had
21   Sentinel adjuster who originally denied the claim.
22             THE COURT:  Right.  And then you had Robins come in
23   and do the second.  Okay.
24             MR. O'MEILIA:  Then we had Robins do an independent
25   adjustment after the plaintiffs requested further
```

1    investigation.

2            THE COURT:  Okay.

3            MR. O'MEILIA:  And we have no objection, and as the

4    plaintiff notes we said in our papers admittedly such topic

5    would be relevant if the business relationship was defined in

6    this case, which it's not defined, as between Sentinel and GAB

7    Robins North America, Inc., specifically with regard to

8    plaintiffs' claim.  That was actually suggested to plaintiff,

9    plaintiffs' counsel in the 37.1 conference and rejected because

10   they want to ask about Sentinel's, some kind of general,

11   whatever business relationship that Sentinel has with GAB

12   Robins without any basis for relevance.  And so -- and again

13   there's no, there's no claim in this case of any fraud, there's

14   no claim of any pattern and practice, there's no claim of

15   anything like that in the plaintiffs' complaint.  This is a

16   singular adjustment and denial of plaintiffs' claim, insurance

17   claim.

18           THE COURT:  Uh-huh.

19           MR. O'MEILIA:  And so the Court, as you may recall,

20   gave plaintiffs some leeway after a hearing we had with respect

21   to subpoenas to GAB Robins, and also to Sentinel, and limited

22   the scope as to -- I'm sorry, Haag Engineering, and limited the

23   scope as to the Haag Engineering subpoena to be just the

24   residential storm files in the last several years, I forget

25   what it was, four or five years in Oklahoma, which turned out

1    to be 14, 15 including plaintiffs' claim.  And then because GAB

2    filed no objection the Court let that subpoena stand and GAB

3    has produced, I don't even know how many files, but there's

4    nothing in those files and certainly plaintiffs aren't going to

5    be able to produce to this Court any evidence from those files

6    showing any pattern and practice of denying claims or Sentinel

7    denying claims and, therefore, I think it's not relevant to go

8    further with this and permit any kind of further fishing

9    expedition.

10        The next objection is details, Topic 14, "Details

11   regarding Sentinel's business relationship with Haag

12   Engineering."  Our argument is similar or actually the same as

13   to Haag Engineering as it is to GAB Robins.  Significantly

14   later, almost two years later after the initial claim -- well,

15   I take that back, it wasn't almost two years later, it was

16   significantly later, many months later the plaintiff had some

17   leakage in their roof after a storm and they again complained

18   to their insurance agency who again called up The Hartford

19   and -- or called Sentinel, excuse me, called Sentinel and asked

20   them to investigate further.  And they then went ahead and said

21   okay, we'll hire an engineering company to come out and look at

22   it, which they hired Haag, and Haag said there wasn't any hail

23   damage to the roof, similar to what GAB Robins found, no hail

24   damage to the roof, and the claim continued to be denied.

25        Now the plaintiff starts off in their objections --

1  well, and I don't even know if that's the initial thing that

2  they said, but -- And we've heard this before about this

3  Watkins vs. State Farm Fire and Casualty Company case down in

4  Grady County where the plaintiffs in that case -- number one,

5  it was a class action and they alleged fraud and they alleged

6  fraud by State Farm.  Hartford wasn't a -- Sentinel wasn't a

7  party to that case and no finding was made as to Sentinel

8  Insurance and no finding was made as to Haag Engineering

9  either.  It was made as to State Farm who -- based on the

10  alleged fraud.  And there's a totally unsubstantiated,

11  unsupported statement in here toward the bottom of page 8 in

12  the last paragraph.  It says, "The evidence uncovered in the

13  Watkins case" -- this is in their objection and response --

14  "revealed that Haag's Engineering reports were fictitious and

15  wrongfully utilized as a pretext to deny legitimate claims.

16  There's no support for that anywhere.  We -- you can look at

17  the verdict forms that they attached themselves and it found

18  that State Farm recklessly disregarded its duty to deal fairly

19  with the class members in its use of Haag Engineering Company.

20  And second, they found that State Farm intentionally and with

21  malice breached its duty to deal fairly and act in good faith

22  with class members in its use of Haag Engineering Company, but

23  it doesn't make any finding and there's no evidence presented

24  by the plaintiff here that supports that statement on page 8

25  that Haag Engineering's reports were fictitious and that kind

1    of thing.  It just -- it just doesn't exist.

2          And then I want to address their citation of Vining

3    vs. Enterprise Financial Group.  I think this Court is well

4    familiar with Vining because you've actually issued an opinion

5    that distinguished Vining from the case that you were

6    considering at the time.  But Vining does not mandate a

7    complete free-for-all in discovery regarding bad faith claims,

8    as what is essentially requested by the plaintiffs here, and it

9    certainly doesn't permit that discovery that they are asking

10   for.  This Court in AG Equipment Company vs. AIG Life Insurance

11   Company, 2008 WL 5205192.  In that case the plaintiff, the

12   Vining plaintiff had actually alleged and proved its bad faith

13   by showing the defendant engaged in a pattern and practice of

14   abusive rescissions of life insurance policies.  No such

15   allegation exists here of any pattern and practice in their

16   complaint.  The Vining claim actually targeted Vining's general

17   business practices.  That is not the case here.  Now of course,

18   the Smiths seem to want it to be the case, even though they

19   didn't make the claim in the case and it's not -- now they have

20   later decided they can just claim it as part of discovery and

21   continue about this fishing expedition.

22         In Vining, Your Honor distinguished Vining from this

23   type of case because the plaintiff had alleged they wanted --

24   that the Financial Group engaged in pervasive, consistent

25   pattern of abusive rescissions.  And as this Court found,

1    Vining's claim targeted Enterprise's general business

2    practices, quote, "general business practices," unquote.  And

3    you held in AG equipment that is not the case here in AG

4    equipment.  And it's not the case in this, in the instant case

5    before Your Honor.

6         The Court found the first amended complaint makes no

7    allegations whatsoever of a general business practice by AIG to

8    deny insurance claims and no such evidence has been proffered

9    in support of the requested discovery.

10        So they are requesting, the Smiths are requesting

11   discovery here with no evidence to support it other than their

12   continued reliance on this Watkins vs. Haag Engineering case

13   which had nothing to do with GAB and has nothing to do with

14   Sentinel Insurance Company, Ltd., my client.

15        And just as an aside, the Watkins case, that class

16   action case was an overhead and profits case as well and was

17   not some kind of denial of a -- one particular claim.  It was

18   an overhead and profits case against State Farm.

19        Deposition Topic No. 15 that we asked the Court to

20   issue a protective order reads, "Sentinel's relationship to" --

21   and this is very important -- "to The Hartford Financial

22   Services Group, Inc.," which is a defendant in this case.  And

23   for short I'll just call them HFSG, Hartford Financial Services

24   Group, Inc.  As the topic indicates, the plaintiff continues to

25   want, as they have throughout their papers in this case,

1    continues to call HFSG quote, "The Hartford."  HFSG is not The

2    Hartford and we have produced evidence of that over and over

3    and over again.

4         And I don't know if the Court had the opportunity,

5    although we -- although we incorporated HFSG's motion and the

6    exhibits to it into this -- into our motion for protective

7    order.  And specifically the primary exhibits that I would

8    point out to the Court that are attached to HFSG's motion for

9    summary judgment is a declaration of Ricardo Anzaldua in

10   support of defendant Hartford Financial Services Group's motion

11   to dismiss which it was also attached to that which the Court

12   found because there were factual issues involved it was better

13   raised on summary judgment which HFSG has now done.  And

14   essentially -- and has the Court had an opportunity to see that

15   affidavit?  If not, I would like to introduce it as --

16        THE COURT:  If it's not attached to your motion for

17   protective order --

18        MR. O'MEILIA:  No, it's not.  I --

19        THE COURT:  -- and it's not attached to theirs,

20   there's no reason why I would be looking at it.

21        MR. O'MEILIA:  Well, as I indicated, we incorporated

22   it by reference herein, but I do have it and would like to

23   submit it.

24        THE COURT:  Any objection?

25        MR. GUNGOLL:  No objection, Your Honor.

1          THE COURT:  Okay.  Let me take a look at it.

2          MR. O'MEILIA:  And I'll just briefly give the Court

3     the highlights.

4          THE COURT:  Uh-huh.

5          MR. O'MEILIA:  This Mr. Anzaldua was the corporate

6     secretary of HFSG and under oath his affidavit says HFSG is not

7     an insurance company, it's not authorized to sell insurance in

8     the state of Oklahoma, it did not issue the policy of insurance

9     to plaintiffs, it did not adjust plaintiffs' insurance claim,

10    and it's the parent company of Sentinel Insurance Company, Ltd.

11         It says Sentinel Insurance Company issued the policy

12    to the plaintiffs.  Sentinel Insurance Company is solvent in

13    good standing with the Oklahoma Insurance Department, and

14    Sentinel Insurance Company, Ltd. conducted the adjustment of

15    plaintiffs' insurance claim.

16         THE COURT:  So there is a relationship between

17    Sentinel and Hartford Financial Services Group.

18         MR. O'MEILIA:  Absolutely.  And --

19         THE COURT:  And so Topic 15 is to have somebody

20    testify and explain that relationship.

21         MR. O'MEILIA:  Which what I'm telling the Court is

22    they are already aware of anything that could possibly be

23    relevant to this case as to the relationship from, number one,

24    this particular affidavit that's filed in the case.  And they

25    can -- if they are permitted to take the 30(b)(6) deposition of

1    HFSG, if the Court hasn't ruled on our motion for summary

2    judgment, which we fully expect a favorable ruling, but that's,

3    you know, that's in the future.  Our Exhibit D to that --

4            MR. GUNGOLL:  Can we just confine this to the topic of

5    the protective order?

6            THE COURT:  Yeah, I mean, we're getting a little off

7    topic here, Mr. O'Meilia.  What I have before me is a motion

8    for protective order with regard to a 30(b)(6) deposition of

9    Sentinel.

10           MR. O'MEILIA:  Yes.

11           THE COURT:  Now, if they, you know -- they've have

12   asked for someone to testify about Sentinel's relationship to

13   HFSG.

14           MR. O'MEILIA:  That's correct.

15           THE COURT:  You've admitted, conceded that there is a

16   relationship.

17           MR. O'MEILIA:  They're the parent, they're the parent

18   holding company but, Your Honor, the point is --

19           THE COURT:  Maybe that's all they have to say, I don't

20   know.  Why would we have a protective order preventing them

21   from even inquiring into that?

22           MR. O'MEILIA:  Well, their inquiry is apparently much

23   further as is indicated here in their papers.  They are trying

24   to assert in their objection an alter ego veil-piercing type

25   theory.  And as this Court well knows, and I have all the

1   federal caselaw on it, in order to assert any type of

2   veil-piercing theory, any type of alter ego theory, number one,

3   it has to be pled in the complaint, which it's not, and it has

4   to be pled with significant specificity.  And of course there's

5   nothing in the complaint about veil piercing and alter ego, but

6   that's what they argue in their papers that they're after.  And

7   so we want a protective order as to that kind of inquiry.  If

8   all they want to know is what is HFSG and what is Sentinel,

9   Sentinel will be more than happy to tell them that they are an

10  insurance subsidiary of HFSG.  And what we've shown by our

11  exhibits to our motion for summary judgment in HFSG by -- also

12  by the Securities and Exchange Commission Form 10-K, HFSG has

13  no significant business operations of its own.  And so all this

14  inquiry and attempt at proving something that's not even a

15  claim in the case should be limited by this Court.  And in that

16  regard I want to discuss their citation and discussion of

17  Oliver vs. Farmers Insurance Group of Companies and Farmers

18  Group, Inc. which is 941 P.2d, 985, Supreme Court of the State

19  of Oklahoma.  Here's where the entire problem lies in this case

20  and what they are attempting to do and how they are attempting

21  in their papers to -- I mean, they mis -- they misrepresent

22  what the Oliver case says.  The Oliver case was -- said you

23  could sue an unincorporated entity, and that was Farmers

24  Insurance Group of Companies, you could sue them because they

25  showed in Oliver that the other defendant, Farmers Group, Inc.,

1    was essentially a management company for all the companies

2    under what was known as a registered service mark, Farmers

3    Insurance Group of Companies.

4         Now what they have tried to do, inappropriately so, is

5    analogize that to this case.  The first and most significant

6    fact is they haven't sued The Hartford.  Now, they could have

7    sued The Hartford based on Oliver vs. Farmers Insurance Group

8    of Companies, and that's because The Hartford is HFSG, Hartford

9    Financial Services Group and together with its subsidiary

10   companies, including it's financial services division companies

11   and it's insurance division companies.  The problem is they

12   can't sue that unincorporated entity, The Hartford, because

13   Hartford Financial Services Group is not a management company

14   like the Farmers Group, Inc. was in Oliver.  See that was the

15   whole thing in Oliver.  The Farmers Group, Inc., which they are

16   trying to analogize to HFSG, was the management company for all

17   its subsidiaries.  Here HFSG is just a parent holding company.

18   It doesn't have -- its only assets are stock and it does not --

19   it's not a management company over any of its subsidiaries.

20        THE COURT:  Let's assume that their reliance on Oliver

21   is completely erroneous.

22        MR. O'MEILIA:  All right.

23        THE COURT:  That still brings us back to why somebody

24   on behalf of Sentinel can't describe their relationship, as

25   you've done here with Hartford Financial Services Group at a

1   30(b)(6) deposition.  Whether or not they can -- you know,

2   whether or not they can ever proceed to trial on a theory

3   against HFSG is another issue.

4           MR. O'MEILIA:  Yes, sir.

5           THE COURT:  But all we're talking about here is a

6   30(b)(6) topic which says have somebody ready to testify about

7   Sentinel's relationship to The Hartford Financial Services

8   Group.  We've conceded there is a relationship.  Tell them what

9   the relationship is.

10          MR. O'MEILIA:  And we will be more than happy to do

11  that if the Court will limit the scope of the questioning to

12  not permit the kind of inquiry that you would go into in some

13  kind of alter ego veil-piercing theory because it is not

14  appropriate because it hasn't been alleged as required by the

15  Federal Rules, and that is the point of our objection.

16          THE COURT:  Well, the problem is it's very difficult

17  for the Court to say I'm going to set a limit on what you can

18  ask in this general area when it hasn't even come up yet.  Now

19  admittedly, they're putting things in their papers that would

20  indicate that's where they want to go.  If that starts to

21  happen, then I think certainly then it's appropriate to seek

22  some relief from the Court.  But on the 30(b)(6) notice itself

23  and what's before the Court -- and I'll talk to Mr. Gungoll

24  here in a moment -- I don't think there's anything certainly

25  improper about having somebody describe the relationship

1    between Sentinel and Hartford Financial Services Group.  How

2    far it goes?  Well, we'll see.

3         MR. O'MEILIA:  I understand the Court's position on

4    that.  Deposition Topic No. 17.  And of course it's Sentinel's

5    role in issuing the plaintiffs' insurance policy including the

6    decision to write plaintiffs' homeowners insurance policy.  The

7    primary point here is it is not an issue in the case, coverage

8    is not an issue in this case.  If the plaintiffs roof was

9    damaged by the April the 8th, 2008 hail storm, it's covered.

10   The entire issue is -- has to do with whether there was hail

11   damage or not.  So anything about Sentinel's role in issuing

12   the plaintiffs' insurance policy including the decision -- I

13   mean, it's way overbroad, there's nothing you can tell from --

14   well, actually you can, you can tell from the content of that

15   topic 17 that it's not relevant.

16        THE COURT:  Mr. O'Meilia, let me ask you this.  You've

17   got these 23 topics here and you're objecting to a number of

18   them, but largely more on the issue of scope --

19        MR. O'MEILIA:  Yes.

20        THE COURT:  -- than the issue itself.  Do you know at

21   this point whether -- how many witnesses do you think are going

22   to have to respond to answer these topics?

23        MR. O'MEILIA:  Well, Your Honor, I'll just give the

24   Court the flavor of what we're doing.  The Sentinel has made

25   the decision that their 30(b)(6) witness, which they normally

1    just have the adjusters do the 30(b)(6), will not be the

2    adjusters, it's going to be somebody at a supervisory level.

3              THE COURT:  Okay.

4              MR. O'MEILIA:  The question that has arisen as to the

5    designation is whether the direct supervisor or supervisors of

6    the two adjusters that were involved in the case be the

7    30(b)(6) witness or witnesses.

8              THE COURT:  Okay.

9              MR. O'MEILIA:  Or whether somebody at a higher

10   supervisory level needs to be the 30Ob)(6) witness, and it

11   depends on the Court's ruling on the scope of some of these

12   things because instead of just the direct supervisor of an

13   adjuster, it could go as high as a mid-level supervisor in

14   those, the answer to some of these things.  So that's -- that's

15   the best I can --

16             THE COURT:  But you could find -- I mean, in other

17   words, you can cover, somebody is going to be able to cover

18   these topics.  There may be objections to how far in scope we

19   go, but obviously someone can testify as to Sentinel's

20   relationship with The Hartford Financial Services Group.

21             MR. O'MEILIA:  Yes.

22             THE COURT:  If we go off into what you say is

23   predicates for an alter ego theory then that becomes -- may

24   become a different matter, but somebody can at least cover the

25   base on those issues pretty fairly.

1           MR. O'MEILIA:  That's correct, Your Honor.

2           THE COURT:  All right.

3           MR. O'MEILIA:  That's correct.

4           THE COURT:  Okay.

5           MR. O'MEILIA:  That concludes my argument as to Topic

6    17, it's just not -- coverage isn't an issue in the case.

7           THE COURT:  Okay.

8           MR. O'MEILIA:  Deposition Topic 18, "Sentinel's

9    compensation arrangement with the plaintiffs' insurance agent,

10   Andy Soares."  How that could possibly be relevant or what the

11   relevance is, that's something that the plaintiff is going to

12   have prove, we believe, to the Court because it's not apparent

13   what the relevance is to the plaintiffs' insurance claim.  The

14   insurance agent, Andy Soares was not involved in any way in the

15   adjustment of this case and --

16          THE COURT:  Soares didn't have anything to do with the

17   decision as to whether or not the roof would be covered?

18          MR. O'MEILIA:  That's correct.  That's correct.  Now

19   if the -- you know, if the Court would -- well, I'll just stand

20   on that.

21          THE COURT:  Okay.

22          MR. O'MEILIA:  And again, I pointed out in here that

23   it's the plaintiffs' insurance agent, Andy Soares.  I mean they

24   can take his deposition, they can find out whatever they want

25   from Mr. Soares, I guess, if they think there's some relevance

1    to that as opposed to trying to get into it through 30(b)(6)

2    without relevance, which they are required to show when it's

3    not ascertainable from the topic itself.

4           THE COURT:  Uh-huh.

5           MR. O'MEILIA:  Deposition Topic No. 19, "Whether the

6    employees of Sentinel also generally serve as employees for The

7    Hartford's other subsidiary entities."  Well, number one, The

8    Hartford is not a defendant in this case.  Also, the relevance

9    of that is not apparent from the content of the topic because

10   there's no issue as to coverage.  Sentinel adjusted the case.

11   What employees they're are talking about, whether we're talking

12   about clerical employees, whether we're talking about -- I

13   don't know what we're talking about, that's the problem with

14   the entire overbroad nature of this particular topic.

15          THE COURT:  Okay.

16          MR. O'MEILIA:  Deposition topic 20, "The weather

17   conditions in the Tulsa metropolitan area, including the cities

18   of Tulsa, Broken Arrow, Sapulpa, Owasso, Sand Springs, Bixby

19   and Claremore with respect to the storm event of April 7th and

20   April 8th of 2008."

21          Well, as I pointed out in our motion, the weather

22   conditions in any other area, other -- even within the City of

23   Tulsa except the immediate area of the plaintiffs' residence

24   certainly isn't relevant.  I mean the question is did hail

25   damage the plaintiffs' roof and have we been in bad faith in

1   denying the plaintiffs' claim for that damage.  I mean even the

2   weather conditions to homes immediately adjacent, you know, to

3   plaintiffs' residence aren't relevant.  Now, plaintiff has

4   tried to say that, well, some of the other people, in fact most

5   of the other people in that neighborhood got their roofs

6   replaced.  Well, they weren't insured by Sentinel.  They -- you

7   know, I don't know what -- what kind of adjustment they have,

8   we don't know what kind of -- you know, even if they all had

9   cedar shakes.  You know, cedar shakes are different in

10  composition, they're different in thickness, they're different

11  in the way they're cured.  You know, we could get on into this

12  ad infinitum.  But the weather conditions, now how is Sentinel

13  supposed to know the weather conditions in all of those areas

14  and try to find out when all we did was adjust the claim as to

15  plaintiffs' house.

16       Deposition Topic No. 21, "All claims for homeowners

17  insurance benefits associated with hail damage that were

18  submitted to Sentinel in the Tulsa metropolitan area," and

19  again, including all those list of cities.  Whether or not

20  somebody else's home is damaged by that -- was damaged by this

21  hail storm and whether we paid it or not has nothing to do with

22  the issue in this case of whether plaintiffs' roof had hail

23  damage.  I think that's -- that's essentially it.

24       And at this point I would just like to mention their

25  continued statement regarding the exception to the

1    Gramm-Leach-Bliley Act.  Obviously there's an exception to the

2    Gramm-Leach-Bliley Act, but it doesn't apply to -- you know,

3    unless the Court finds that the topics are relevant.  And

4    trying to get into other insureds' files is a violation of

5    those other insureds' privacy which Hartford is required to

6    protect under the Graham-Leach-Bliley Act.  And just because

7    the plaintiff wants to look at them -- and the Court has

8    already, the Court has already granted a subpoena to Haag

9    Engineering and to GAB for their files, but to just let them go

10   on the -- the exception only applies, number one, if it's

11   relevant; and number two, if the Court were to balance that

12   relevance against the fact that it's providing information as

13   to other insureds because it's just not -- the relevance is so

14   minimal, if any, here to violate those persons' right to

15   privacy.

16        Deposition Topic No. 22, "The condition of the area in

17   the immediate vicinity of plaintiffs' residence in the wake of

18   the April 7th and 8th 2008 hail storm."

19        Well, I mean it's undisputed that the first adjuster

20   that got out there for Sentinel didn't get there until April

21   29th, 2008.  So the condition of the area in the immediate

22   vicinity of plaintiffs' residence in some unidentified wake,

23   undefined wake of the hail storm is overbroad, it can't

24   possibly be calculated to lead to the discovery of admissible

25   evidence.  Maybe the condition when he got out there and looked

1    at and did his investigation may be relevant.  But, you know,

2    the kind of topics that they throw out here are overbroad on

3    their face and that was where I started my argument.

4         And the final one is Deposition Topic No. 23 which is

5    the most overbroad of all of them, "Investigation" -- it

6    doesn't say whose investigation, it just says "Investigation of

7    claims for hail damage involving properties that are adorned

8    with wooden shake roofs."

9         I don't even thinking I need to argue that one, Your

10   Honor.

11        THE COURT:  Okay.  All right, Mr. Gungoll.

12        MR. GUNGOLL:  Yes, Your Honor.  May it please the

13   Court.  Your Honor, if I may start out by talking a little bit

14   about the fairly amazing lack of cooperation that we're

15   experiencing in discovery to this point.  We just filed a

16   motion for extension of dates.  We are -- we've also had to

17   file a motion to compel because beyond the documents that

18   Sentinel produced in their initial disclosures, Sentinel has

19   produced a total of 35 documents.  Of those 35 documents 32 of

20   them are photographs.  Okay.  Hartford doesn't seem to think

21   that it's subject to -- HFSG, The Hartford Financial Services

22   Group, does not seem to think that it's even subject to the

23   Federal Rules of Civil Procedure in this case.  And if I may --

24        MR. O'MEILIA:  Excuse me, Your Honor, are we dealing

25   with Sentinel here or the motion for protective order?

1          MR. GUNGOLL:  Well, I'd just like to --

2          THE COURT:  All right.  Mr. O'Meilia, I gave you some

3     leeway --

4          MR. O'MEILIA:  I understand.

5          THE COURT:  -- in terms of discussing, so I'll let Mr.

6     Gungoll do it, but I do want to get back on point.

7          MR. GUNGOLL:  Okay.  Yes, Your Honor, this is just --

8     this will just be real brief.  I just would like to demonstrate

9     to the Court.  This was the Interrogatory No. 2 to HFSG:

10          "State the name, title or position, address and

11     telephone number of the person answering these interrogatories."

12          "Answer:  Subject to and without waiving HFSG's

13     objections to each interrogatory, undersigned counsel for HFSG

14     directs plaintiffs to business records of HFSG from which the

15     answers given subject to those objections may be ascertained.

16     Specifically The Hartford Financial Services Group, Inc.'s

17     publicly filed 2011 SEC form 10-K and all of its other publicly

18     filed reports and documents found at the SEC's EDGAR database

19     www.sec.gov," et cetera.

20          THE COURT:  Okay.  Yeah, I think that's an

21     inappropriate response, but it's not before me today and it's

22     not helping me at all --

23          MR. GUNGOLL:  Okay.

24          THE COURT:  -- with what is before me today.

25          MR. GUNGOLL:  Okay.  Okay.

```
1              THE COURT:  So I would really like to get back on
2      point.
3              MR. GUNGOLL:  Okay.  All right.  If we may get back on
4      point.
5              THE COURT:  And I think what, you know, what we need
6      to focus in here on is as I understand this case the Smiths
7      have a claim that they suffered hail damage to their roof that
8      was covered, in their estimation covered by their policy with
9      Sentinel and should have been paid.  And as I read through
10     this, I do have a clawing feeling that we're losing sight of
11     that, that we're way -- that we're outside the box.  And I
12     think, you know, you're entitled to some leeway to better
13     understand the relationships between the various entities here.
14             MR. GUNGOLL:  Okay.
15             THE COURT:  But you know, there's going to be, there's
16     going to be -- if we need to we'll put a very strict confined
17     definition on where we're going with these depositions.
18             MR. GUNGOLL:  Okay.  Well, if I may.  We had
19     originally moved to amend.  We're bound in this case by our
20     state court petition.
21             THE COURT:  Okay.
22             MR. GUNGOLL:  Because the action was removed to
23     federal court.  We previously moved to insert a fraud claim on
24     the basis of HFSG's various representations that it's not an
25     insurance company, when we believe the evidence clearly
```

1    demonstrates that it is.

2            THE COURT:  Okay.

3            MR. GUNGOLL:  Now the allegation is that the

4    plaintiffs had an insurance policy with both Sentinel and The

5    Hartford Financial Services Group, Inc., and we contend that

6    both entities in bad faith breached that contract.

7            THE COURT:  Okay.

8            MR. GUNGOLL:  So that's the basis of the claim.

9            THE COURT:  And where does the fraud claim stand?

10           MR. GUNGOLL:  The Court did not permit us leave to

11   amend.  Now --

12           THE COURT:  All right, so it's not in the case?

13           MR. GUNGOLL:  It's not in the case.

14           THE COURT:  All right.  So again, let's focus on what

15   we do have in the case.  And I understand you've got -- so

16   you've essentially have got a breach of contract claim --

17           MR. GUNGOLL:  Yes.

18           THE COURT:  -- and a bad faith claim --

19           MR. GUNGOLL:  Yes.

20           THE COURT:  -- against these two entities?

21           MR. GUNGOLL:  Against the two entities.  We contend

22   that they both --

23           THE COURT:  And Judge Frizzell denied the motion to

24   dismiss on Hartford Financial Services Group based on the

25   allegations that were in the petition without getting into

```
 1    whether there was sufficient evidence to support them, that's
 2    what we'll address --
 3              MR. GUNGOLL:  Yes.
 4              THE COURT:  -- what we'll address on summary judgment.
 5              MR. GUNGOLL:  Yes.  And Your Honor, HFSG has moved for
 6    summary judgment --
 7              THE COURT:  Okay.
 8              MR. GUNGOLL:  -- on the basis that it's not an
 9    insurance company, that they had nothing to do with this and we
10    contend that that's not the case.
11              THE COURT:  Is there any -- is there any -- I mean, do
12    you have a legitimate concern that Sentinel, that if you
13    prevailed on your claim that Sentinel couldn't pay?
14              MR. GUNGOLL:  Your Honor, I'm not entirely certain
15    because they've not produced any documents.  We can't get them
16    to comply with discovery so I don't even know the answer to
17    that question.  They keep asserting about their solvency --
18              THE COURT:  Okay.  But do you have any reason to think
19    that there's a solvency question or any kind of inability on
20    Sentinel's part to pay a judgment if one -- well, what are we
21    talking about in terms of the amount of the roof damage?
22              MR. GUNGOLL:  The amount of damages, it's right around
23    $40,000.
24              THE COURT:  40,000 for the roof?
25              MR. GUNGOLL:  Yes.
```

1          THE COURT:  Okay.

2          MR. GUNGOLL:  Well, and that also includes their

3     remediate -- the additional things that we've had to pay.

4          THE COURT:  Okay.

5          MR. GUNGOLL:  So it's roughly 40, $40,000 plus

6     accruing attorney's fees and other considerate --

7          THE COURT:  Okay.  And is there any reason for you to

8     think at this point, whether or not you know whether Sentinel

9     could write that check, is there any reason to think that they

10    couldn't?

11         MR. GUNGOLL:  No.

12         THE COURT:  I just was curious why we're going down

13    this particular road?

14         MR. GUNGOLL:  Well, I mean it's comparable to the

15    Oliver case because we contend that we were under the

16    impression that we had an insurance contract with The Hartford

17    Financial Services Group, Inc.  We think that the evidence

18    shows that.  It's our position that whether or not sufficient

19    evidence exists to proceed under an alter ego theory is a --

20    it's a threshold evidentiary question and we've got to have the

21    evidence to see whether or not that's borne out.  I mean at

22    this point, we weren't familiar with the facts of this case

23    when we filed our state court petition.  We've subsequently,

24    you know, having to do basically our own discovery have

25    acquired some stuff and we're trying to get some more, but

1    they're -- you know, this case is still very much in its

2    formative stage and that's why we've asked for the extension

3    because we can't get any discovery.  We don't know exactly

4    what's there with respect to an alter ego type of theory.  I

5    mean, I think the evidence is pointing in that direction if you

6    look at the documents that we attached to this --

7            THE COURT:  It's just that, Mr. Gungoll, as I look at

8    this, and I've seen a number of these things, I mean I think, I

9    think both of you are getting way off the beaten track.  I

10   think some of the discovery responses that I've heard and I've

11   seen in the past are -- border on ridiculous.  And I think some

12   of what we're getting into here, I think, is losing track of

13   the sight that you've got people that want to know whether the

14   insurance company appropriately denied their claim for hail

15   damage and all of a sudden we're, you know, marching forward,

16   spending a lot of money and spending a lot of time on theories

17   that ultimately may really not have a lot to do with this case.

18   I don't know.  I mean, I don't know.  You're entitled to

19   obviously do discovery and find out, but just because you file

20   a lawsuit doesn't mean that you get to discover every piece of

21   paper and decide what other sorts of multiple claims you might

22   bring.  I mean we've got to keep this thing focused on what's

23   before the Court right now.

24           MR. GUNGOLL:  Okay.  I appreciate that, Your Honor.

25           THE COURT:  All right.

1        MR. GUNGOLL:  If I may, I guess the best way to do it,

2   just kind of go through each item sequentially.

3        THE COURT:  Well, I don't know that we're getting

4   anywhere, frankly going that way because I think the topics

5   with some exceptions -- and I think when you can get into

6   trying to get a 30(b)(6) on the weather conditions in Tulsa.  I

7   mean you're essentially asking The Sentinel to put up a

8   corporate rep who's going to espouse the company's policy or

9   the company's position on the weather conditions in Tulsa.

10        MR. GUNGOLL:  Well, Your Honor, the basis for that was

11   the documents that we received in the initial disclosures from

12   Sentinel, part of it was the Haag Engineering Report and a lot

13   of that is devoted to weather issues, so I think that's

14   relevant to the case.  I mean what --

15        THE COURT:  I mean is there any -- is there a dispute

16   here that there was a hail storm?

17        MR. GUNGOLL:  No, there's no dispute.  The dispute

18   would be as to the magnitude, I believe.

19        THE COURT:  I just -- you know, I just don't know that

20   whether somebody sitting in Hartford is going to have a

21   company, be able to espouse a company position on the weather.

22        MR. GUNGOLL:  Well, and I mean to be honest with you,

23   Your Honor, they may well not.  And if that's the case then

24   that would be sufficient.  I mean, I think a lot of this stuff

25   could have been worked out, as I've said in there, by a

1   teleconference.

2           THE COURT:  Well, it should have been worked out.

3           MR. GUNGOLL:  Yeah.

4           THE COURT:  A lot of it should have been worked out.

5           MR. GUNGOLL:  And so, you know, I mean if that's the

6   case that they don't know, then so be it.  I mean we can live

7   with that kind of response.

8           THE COURT:  Here's where, you know, I think you ought

9   to go.  I think that the topics, I think when you get into the

10  weather conditions, all claims, you're over the line.  I think

11  in general the topics you've got set out here for the 30(b)(6)

12  are appropriate depending on how they are handled.  And so what

13  I would suggest to you folks is that you try to refine this

14  list of topics if you can.  You do that deposition, the

15  30(b)(6).  If it turns out that more people are going to be

16  involved in this and you're going to have start bringing

17  people, more people down, or you're going to be going up to

18  Hartford, whatever the case would be, and there's problems

19  developing over the scope, the Court will step in at that

20  point, once I get a sense of what's going on at these

21  depositions, and if need be we'll just put hour limits on here.

22  If you want to spend, if you want to spend your time asking

23  somebody about the weather conditions in Tulsa in 2008, that's

24  fine, but you won't be getting a whole lot of time then to go

25  to what the heart of the matter is.  I mean that may be one way

1    to simply get you folks focused here.  You put up your 30(b)(6)

2    witness and you get a total of X number of hours and if you

3    want to spend it on the weather, have at it, and see whether

4    that goes anywhere, have at it.  But when it comes down to

5    finding out what you want to know about the Smiths' claim, you

6    may not, you may not get a whole lot more information if you're

7    going to waste your time and everybody's time here.

8            MR. GUNGOLL:  Okay.  Your Honor, with respect to Item

9    No. 21, we would like to elicit testimony regarding all claims

10   for homeowners insurance associated with hail damage in the

11   Tulsa area as a result of this storm.  I mean is that --

12           THE COURT:  What are you wanting them to tell you?  I

13   mean --

14           MR. GUNGOLL:  Well, we would just like to know whether

15   there were additional claims; if so, what were they?  We asked

16   that information in our discovery requests but there were no --

17   very evasive responses.

18           THE COURT:  Where is the Smiths' home located?

19           MR. GUNGOLL:  It's -- I'm trying to think of what the

20   street is.

21           THE COURT:  Is it within the Tulsa city limits?

22           MR. GUNGOLL:  Yes.

23           MR. O'MEILIA:  Yes, it's like hundred and, it's around

24   114th and --

25           MR. GUNGOLL:  104th Place or something, 114th Place.

1          THE COURT:  All right.  So if there was a claim for

2     hail damage up in Claremore is that really going to be of a

3     great deal of relevance to you in trying to prove that, in

4     fact, Sentinel's decision not to pay benefits on the Smiths'

5     claim is bad faith or a breach of contract?

6          MR. GUNGOLL:  Well, I mean I guess that would go

7     somewhat to the track of magnitude of the storm.  I mean, where

8     there were damages incurred, how big it was.  So I think, I

9     mean, I see the relevance there.

10          THE COURT:  I mean what you're essentially looking for

11     is something like how many, how many claims did they process as

12     a result of that April 2008 hail storm?

13          MR. GUNGOLL:  Yes, Your Honor.

14          THE COURT:  How many were there and --

15          MR. GUNGOLL:  How many were there and what happened to

16     them.  I mean, you know, we know that there's --

17          THE COURT:  Well, again, I think you're pushing the

18     edge of relevance in this sense, I think.  That you know,

19     whether -- if somebody up in Claremore had hail damage and got

20     their claim paid still doesn't, in my estimation, advance the

21     ball very much in terms of whether the Smiths also suffered

22     hail damage that should have been covered because as we all

23     know it can be widely different conditions.

24          MR. GUNGOLL:  If I could speak to another kind of

25     issue relative to us wanting to talk about HFSG things, it

1    would be that -- and again, that's why some of these topics

2    address whether the employees also work for other subsidiaries

3    is because I think it's important and relevant for us to get

4    the information as to what other HFSG, The Hartford insureds

5    had policies in that immediate area.  We know for sure there

6    was a house about four or five houses away that was insured by

7    The Hartford.  It wasn't Sentinel specifically, but they

8    presumably had the same claims adjusters, claims handlers, and

9    that roof was replaced.  So I mean, I think that's clearly

10   relevant.

11          THE COURT:  So you've got a different insurance

12   company, although under the same umbrella, but a different

13   company.

14          MR. GUNGOLL:  And so --

15          THE COURT:  And you think the adjusters were the same?

16          MR. GUNGOLL:  I think it's entirely possible.  I mean

17   it --

18          THE COURT:  Well, there's a difference between it's

19   entirely possible and they were the same.  I mean I think --

20          MR. GUNGOLL:  I have reason to believe that they are,

21   they would be the same, yes.

22          THE COURT:  And what is your reason to believe that?

23          MR. GUNGOLL:  Well, I mean they all seem to work under

24   the same umbrella of The Hartford.

25          THE COURT:  Who is they?  Who are we talking about?

1          MR. GUNGOLL:  Well, the individual who they presented

2     at their -- at our settlement conference, you know, worked --

3     bore a business card that said that he worked for The Hartford,

4     but I guess apparently not HFSG specifically.  I think that

5     they all work among -- I'm not even sure exactly what the

6     controlling entity is, who they are working for, but I think

7     that that's relevant to this case to the extent that other folks

8     working for other subsidiaries are one and the same, I think we

9     should be entitled to get into those areas and those questions.

10          THE COURT:  Well, again, I think, you know, obviously

11     at this stage of the game under Rule 26 we've got a very broad

12     definition of relevancy.  I mean, I can't, I can't say that

13     what you're suggesting would not under any stretch of the

14     imagination be impossible to advance the cause here.  I think

15     it's -- I think the farther you get away from the Smiths' claim

16     and the circumstances surrounding it, the relevancy starts to

17     wane.  And again it's a matter of where you want to put your

18     time and your client's money.  I think, you know, if you want

19     to explore that area a little bit, that's fine, but if it gets

20     to the point where we're dwelling on those sorts of things and

21     this takes on the look of a true fishing expedition where

22     there's nothing out there, then I think the Court will be more

23     interested in interceding at that point.  At this stage of the

24     game I think the topics are, some of them are problematic, but

25     in general I think they are okay.  When we start seeing what

1    goes on at the depositions then I think there will be more,

2    more to talk about.

3           MR. GUNGOLL:  Okay.

4           THE COURT:  Do you folks -- in other words, what I'm

5    saying here, Mr. O'Meilia, is I'm not going to grant a

6    protective order on the basis of these topics as they are

7    outlined here.  I think when you get into a deposition -- and

8    I'm encouraging both of you to use better judgment than what

9    I've seen so far -- that when the two of you get into the

10   deposition give them a little leeway on where they are going,

11   but at some point, you know, if this drags on for hours and we

12   do a six hour deposition on one 30(b)(6) and then we're

13   supposedly going to bring two or three more down here talk

14   about the weather and everything else, I think a protective

15   order at that point would be on more fertile ground, because

16   once I start to see what the questions look like and see if

17   they are going anywhere that seems targeted on the specific

18   issues in this case.  If it looks like we are wandering afield

19   then we won't be doing this, we won't be bringing multiple

20   people down here to talk about whether somebody in Claremore

21   filed a claim and got their roof replaced by a different

22   insurance company that might be related to Hartford Financial

23   Group.

24           MR. GUNGOLL:  Well, again, I mean that would -- that

25   consideration would bear upon why we've also filed suit against

1    HFSG because we believe that they were our insurer, and so I

2    think that there's a commonalty there and that we should be

3    entitled to that kind of --

4          THE COURT:  Well, you've sued them and they are in the

5    case.  They haven't been thrown out on summary judgment, so I

6    think you're entitled to explore some issues with them.  My

7    only point is that at some point if it looks like that's not

8    fertile ground and if it looks like you've made a mistake, you

9    would be better to recognize that and, you know, sort of

10   revisit where the lawsuit is.  If it turns out that HFSG is not

11   an insurance company or doesn't have that -- you don't really

12   need to go down that road to try and figure out whether or not

13   this claim was properly denied, you know, then I think that's

14   the time to reassess and see where this lawsuit is going.

15         MR. GUNGOLL:  Okay.

16         THE COURT:  Mr. O'Meilia, do you understand where

17   we're going here?

18         MR. O'MEILIA:  Well, yes, Your Honor, I understand

19   what the Court is saying, but in indicating that the Court is

20   going to deny the protective order, the Court said that some of

21   these topics are -- are outside of what they should be.

22         THE COURT:  I think they are bordering on -- you know,

23   the weather conditions one is a good example.  And some of

24   these, like you say, are rather broadly worded.  "Investigation

25   of claims for hail damage involving wood shake roofs."  Well, I

1    think it's hard in a 30(b)(6) deposition notice to know whether

2    that topic is totally off base or not.  It's really a matter of

3    how it's handled at the deposition.  If there's some

4    questioning about that, there could be some questioning on that

5    topic that could be relevant to the case, I think, or I can't

6    say at this point that it wouldn't be, that it wouldn't

7    conceivably be relevant.  If it turns out, though, that we

8    spend two hours, you guys spend two hours talking about all

9    sorts of claims on wood shake shingles that are outside the

10   area and may not even be tied into this particular event, then

11   I think a phone call to the Court would be appropriate at that

12   point and I'll step in and we'll put an end to it.  You know,

13   you've got to get this thing focussed on both sides and figure

14   out what exactly do you think, is there really something that

15   the people in Hartford are going to know about these weather

16   conditions that would help you, and if so, let's get that out,

17   let's ask them some questions and be done with it.  Is there

18   really something about the investigation of claims for hail

19   damage on wood shake shingles or are we just trying to put

20   together a broad list here so that when we get to the

21   deposition we've got things covered, they are on notice what

22   we're looking for and we can go on down the road?  Some of

23   these things may drop out.  I suspect a lot of these would

24   dropout in the deposition because I don't think it's going to

25   be particularly fertile ground, but I don't know.

1           MR. GUNGOLL:  But I mean with respect to the last one,

2    for example, we're just wanting to talk about their general

3    claims handling practices with respect to investigating damage

4    on wood shake roofs.  I mean --

5           THE COURT:  Is there any difference, do you think

6    there's any difference on their practices with wood shingles as

7    opposed to any other shingles?

8           MR. GUNGOLL:  Versus composite, for example?

9           THE COURT:  Yeah or --

10          MR. GUNGOLL:  I would think so.

11          THE COURT:  You think there's --

12          MR. GUNGOLL:  I mean, I think there's different damage

13   considerations, you know, as far as --

14          THE COURT:  Well, I guess that's, you know, you can

15   explore that.

16          MR. GUNGOLL:  But I wouldn't anticipate that taking,

17   you know, hours upon -- and the same with the weather.  I mean

18   it's --

19          THE COURT:  I mean I think if you bring somebody, you

20   get a 30(b)(6) witness who can arguably address these topics

21   and if it sounds like they are getting too far afield or that

22   your witness can't answer the degree of detail that they are

23   looking for, then we will revisit this topic.  And maybe what

24   we do is set a time limit.  You've got so many hours, you know,

25   to take these, to take a 30(b)(6) deposition and you spend it

1   how you want.  If you want to spend it on weather and

2   investigation practices for shake shingles, have at it.  But,

3   you know, you may, you may sacrifice some discovery on what

4   seems to me to be the core of the lawsuit.

5        MR. O'MEILIA:  Well, Your Honor, here is where I was

6   going when the Court inquired as to whether I understood on

7   behalf of --

8        THE COURT:  Mr. O'Meilia, will you either sit and

9   speak into the mic or step up, I don't care which, but I need

10  to get you on the recorder.

11       MR. O'MEILIA:  The concern that I have and the concern

12  that my client has had since the beginning is take, for

13  example, the questions about Bixby and Broken Arrow and Sand

14  Springs and Claremore.  Are we supposed to try to find a

15  witness and spend the time for that witness to go through and

16  try to determine what the weather conditions were in those

17  places, or and the claims that may have been to Sentinel

18  arising out of that particular hail storm when that's not

19  relevant.  Because we spent, myself and -- Wade Gungoll was not

20  participating in the 37.1 conference, it was Brad Gungoll --

21  and we went through this kind of thing.  And it was basically

22  we want the questions asked, we're going to ask all these

23  questions about this, this, this, and this and about every

24  claim that you guys had arising out of that hail storm in all

25  these cities and this kind of thing.  And we're going, we've

1    got to file for a protective order because we can -- it's not

2    relevant and trying to have a witness prepared to talk on those

3    topics when number one, it's not relevant; number two, it's

4    burdensome; and number 3, those are way overbroad --

5         THE COURT:  Okay.  Well, let's --

6         MR. O'MEILIA:  -- this is why we asked for the

7    protective order.

8         THE COURT:  Let's cut through this.  On number 20 for

9    example, I think Tulsa and Broken Arrow, I mean that house

10   sounds like it's out south; right?

11        MR. O'MEILIA:  It's out south, yes.

12        THE COURT:  Okay.  I think Tulsa and Broken Arrow.  I

13   don't think that Sapulpa, Owasso, Sand Springs, Bixby and

14   Claremore have anything to do with this, you know, if you're

15   talking about weather conditions.  I mean if somebody knows the

16   weather conditions in Tulsa and Broken Arrow on that date it's

17   probably going to be the same as the others, so let's pare this

18   stuff down.

19        "All claims for damage in the Tulsa metropolitan

20   area."  I mean again I think, you know, Tulsa and Broken Arrow,

21   or in the others, I mean if there's some general number of how

22   many claims they got out of this storm and how many were

23   denied, something like that.

24        MR. GUNGOLL:  Yes, Your Honor.

25        THE COURT:  But seriously if this is going to be, if

1    this is going to become some or deal by fire where we're going

2    to be spending lots of time, you know, grilling people, some

3    30(b)(6) witness over all this stuff and playing gotcha on

4    either side, it's not going to happen.

5            MR. O'MEILIA:  And that's the problem with our concern

6    is --

7            THE COURT:  I think you start off with Tulsa-Broken

8    Arrow which is the area where this house is located.

9            "The condition of the area in the immediate vicinity

10   of the plaintiffs' residence."  I don't know what means.  I

11   think that's off the table because I don't understand it, when

12   you talk about the condition of the area.

13           I would say, you know, 20 and 21 are limited to Tulsa

14   and Broken Arrow, 22 is off the table.  You know, I've got

15   reservations about some of these others, but again given the

16   status of the lawsuit I can't say at this point that there's no

17   conceivable relevance, but I think you're stretching those.

18           Mr. Gungoll?

19           MR. GUNGOLL:  Your Honor, we've got -- we just filed a

20   motion to compel to try to get the answers to these questions.

21   For example, how many other insureds throughout Tulsa they

22   have.  So you know, if they were being cooperative in discovery

23   we may know that information.  And there may be one claim, two

24   claims.  I don't -- you know, it's hard to say without them

25   being cooperative in discovery.

1          THE COURT:  Well, being cooperative in discovery is

2     keyed to being cooperative in relevant discovery.  And just

3     because someone comes in and says I want all of your

4     information on every claim that was filed April 7th-8th, 2008,

5     that doesn't necessarily mean that the other side has to turn

6     everything over to be cooperative.  If there's not much

7     material it makes sense sometimes to get over the hump and do

8     it and not just, you know, not just stonewall on the thing and

9     say I think I've got a viable objection.  I think there comes a

10    point when it's a lot smarter to say we could fight over this,

11    but here, you can look at it, we've got a protective order in

12    place, here's what it is.  We only had, 14, 15 claims look at

13    them, see what you think.  But you know, when we get past all

14    of this it's still going to come down to, I think, did Sentinel

15    and whoever worked with them, properly deny a claim on the

16    basis that they didn't suffer hail damage on their roof.  I

17    mean that's what it comes down to.  And all this stuff about

18    whether they are involved under an umbrella organization with

19    similar employees with other insurance companies, could that,

20    could that have some relevance?  Conceivably.  But I think in

21    terms of where I would want to put my money in the discovery

22    process, that seems like a long way down the road.  You know, I

23    think you folks have both got to do your clients a better

24    service in terms of focusing this lawsuit and producing what

25    needs to be produced and giving them the information that they

1    need because ultimately it comes back, we're going to save

2    everybody some money, we're going to find out whether there's

3    anything here to fight over.  But if we start -- if we fight

4    constantly through the discovery process, you know, you're just

5    spending a lot of money without advancing the ball on either

6    side.  So I think that the motion --

7              MR. GUNGOLL:  I agree with that.

8              THE COURT:  We will show the motion as denied in part,

9    granted in part.  It's granted as to Items 20 and 21 and 22.

10   It's denied as to the others with the caveat of what I've gone

11   through here with you folks that, you know, get this thing

12   focused and make sure that whoever is taking these depositions

13   has their questions ready to go and they are on point because

14   if we start meandering around then, Mr. O'Meilia, at some point

15   you can invoke the assistance of the Court at the appropriate

16   time and we'll step in and we'll take a look at it.  We'll look

17   at the transcript and see, and if it's just a huge fishing

18   expedition that doesn't seem to be advancing the ball anywhere,

19   then we'll start putting limits on this or have the depositions

20   done down here at the courthouse if that's what it takes.  You

21   know, I've babysat them before, I'll do it again.  I don't like

22   it, it shouldn't be necessary, but if that's what it's going to

23   take to get this thing resolved and get the discovery wrapped

24   up, then that's what we'll do.

25             MR. O'MEILIA:  May I make one comment to the Court?

1           THE COURT:  Uh-huh.

2           MR. O'MEILIA:  This is just because the Court has

3    indicated that we may not have been cooperating in discovery

4    because they're filing -- they're filing all these motions.

5    Counsel said that we had only given them 35 documents in

6    addition to what we gave them in Rule 26, our 26 initial

7    disclosures.  We gave them our entire file as part of the Rule

8    26 disclosures and then when they didn't think they had it all

9    we went back and I think we gave them essentially the same

10   photographs and things that we had given them before.

11          In addition, in an effort to cooperate in discovery,

12   we went to this Andy Soares, their insurance agent --

13          THE COURT:  Right.

14          MR. O'MEILIA:  -- and asked him to produce his file on

15   it.  We didn't have that file, we asked him to produce his

16   file.  He gave us his file and we turned that to the plaintiff

17   and they are just not satisfied.  They want all this extraneous

18   matter that has noticing do with their claim.  And that's the

19   problem.

20          THE COURT:  Well, I mean there is conceivable that,

21   you know, if Haag Engineering or somebody, if there was -- if

22   there's some financial relationship there, it's conceivable

23   that there could be bias in the claims handling process.  I

24   think some targeted inquiry about that would get us over the

25   hump and we will find out whether the decision to deny coverage

1    was proper or not and whether it followed some routine

2    practices and those routine practices are acceptable.  So I

3    think there's, you know, there's room here beyond the strict

4    dictates.  I understand that the defense would like to draw a

5    very tight, narrow ring about what's discoverable, and I

6    understand that the plaintiff would like to have a much broader

7    ring about what's discoverable, but there's a happy medium and

8    I think they are entitled to at least make some initial inquiry

9    into some of these areas to see whether there's anything worth

10   proceeding with.  If they -- you know, if they -- I would

11   assume that if they find that there's really no basis for an

12   alter ego claim or that HFSG is not an insurer that, you know,

13   they can drop back, rethink it and focus their energies where

14   it ought to be focused, but I think they are entitled to at

15   least make some inquiries on that.  All right.

16          MR. O'MEILIA:  Yes, Your Honor.

17          THE COURT:  And so that, my last point is simply to

18   reiterate that, you know, you start this 30(b)(6) and give them

19   some leeway in terms of asking some questions.  And you know,

20   if somebody can't, if a corporate rep can't answer about the

21   weather conditions in Owasso or whatever, you have to bring

22   somebody else, then we'll talk, we can talk about that.  And

23   you know, if it gets too far afield then there will be

24   limitations placed on how many hours you're going to get doing

25   this, because we're not just going to keep bringing 30(b)(6)

1    down here saying, well, this guy didn't know enough about the

2    weather so we need another one.  It's not going to happen.

3    Both of you have got to be a little more reasonable than what

4    I'm seeing in the papers so far.  There's a lot, I mean, I

5    can't believe this much paper has been filed on this particular

6    dispute, but whatever.  All right?

7                MR. O'MEILIA:  Yes, Your Honor.

8                THE COURT:  Are we clear?  Okay.

9                MR. GUNGOLL:  Thank you.

10                MR. O'MEILIA:  Thank you.

11                (Court adjourned.)

12

13                A TRUE AND CORRECT TRANSCRIPT FROM
                 THE ELECTRONIC SOUND RECORDING OF THE
14                PROCEEDINGS IN THE ABOVE-STYLED MATTER.

15
                 CERTIFIED:   s/ Glen R. Dorrough
16                             Glen R. Dorrough
                               United States Court Reporter
17

18

19

20

21

22

23

24

25